243 F.3d 687 (2nd Cir. 2001)
 THERESA GREGORY, Plaintiff-Appellant,
v.
EDWARD J. DALY, individually and in his capacity as Executive Director of Community Action Agency of Greene County, Inc. and COMMUNITY ACTION AGENCY OF GREENE COUNTY, INC., Defendants-Appellees.
 Docket No. 00-7077
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: August 9, 2000
Decided: March 27, 2001
 
 Appeal from the judgment of the United States District Court for the Northern District of New York (Lawrence E. Kahn, Judge) dismissing, for failure to state a claim upon which relief can be granted, plaintiff's claims of sex discrimination and retaliation by her employer.
 AFFIRMED in part, VACATED and REMANDED in part.[Copyrighted Material Omitted]
 KEVIN G. MARTIN, Kernan and Kernan, P.C., Utica, NY, for Plaintiff-Appellant.
 JAMES T. TOWNE, JR., Thorn Gershon Towne Tymann and Bonanni, LLP, for Defendants-Appellees.
 Before: CALABRESI, CABRANES, and POOLER, Circuit Judges.
 CALABRESI, Circuit Judge:
 
 
 1
 Plaintiff-appellant Theresa Gregory brought suit in the United States District Court for the Northern District of New York (Lawrence E. Kahn, Judge) alleging that her former employer, defendant-appellee Community Action Agency of Greene County, Inc. ("CAAGC"), and her former CAAGC supervisor, defendant-appellee Edward J. Daly, discriminated against her based on her sex and, when she objected, retaliated against her, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Gregory claims that Daly subjected her to a barrage of sexual ridicule, advances, and intimidation, intensified his harassment in response to her complaints, stripped her of work responsibilities, otherwise undermined her ability to do her job, deprived her of salary increases, and ultimately fired her. The district court, however, granted defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim. Because the district court erroneously analyzed some of plaintiff's claims, and overlooked others, we vacate the judgment of the district court insofar as it dismissed plaintiff's claims against CAAGC, and remand for further proceedings. We affirm the district court's decision insofar as it dismissed plaintiff's claims against Daly.[1]
 
 Background
 
 2
 In her complaint, as well as in her charge of discrimination before the Equal Employment Opportunity Commission ("EEOC") (which she expressly incorporated into the complaint by reference), Gregory made the following allegations, which we take as true for the present purposes.
 
 
 3
 Gregory began working for CAAGC in 1988, and, after several promotions, she was, at the time of the relevant events, Education Coordinator in CAAGC's Head Start Department. In September 1996, Daly became CAAGC's Executive Director, and the workplace environment began to deteriorate. Soon after entering his new post, at the meeting in which Gregory was first introduced to him, Daly made "demeaning comments about women." Later, Daly made further "demeaning comments of a sexual nature," engaged in "behavioral displays of a sexual nature, and made unwelcome physical contact...of a sexual nature" with Gregory. In particular, Daly asked Gregory if she knew what a "sexual perpetrator" was, explained "in graphic detail[]" how a rape may occur, told her "how easy it is to rape a woman," and "described sodomy and anal intercourse relating to boys in detail." Gregory further alleges that Daly repeatedly came into her office, closed the door, and stood uncomfortably close to her, despite her requests that he move away.
 
 
 4
 In response to these actions, Gregory complained both to her immediate supervisor and to Daly directly. The supervisor, however, was herself terminated after making similar complaints about Daly, and Daly's reply to Gregory's complaints was that she should "get on board or quit." Gregory's new supervisor, acting on Daly's instructions, imposed novel restrictions on her work activities, including the requirement that she, unlike other employees, provide a "minute by minute" record of her movements.
 
 
 5
 In April 1997, Gregory, along with other CAAGC employees, filed a lawsuit in state court concerning Daly's behavior,[2] and Gregory continued to file internal grievances concerning him. Despite Gregory's complaints, her employer did nothing to stop Daly's actions. In the meantime, Daly's conduct worsened. He made hostile comments concerning the lawsuit Gregory had filed, started to threaten her job, and subjected her to baseless disciplinary actions. According to Gregory, her ability to do her job began to be compromised by Daly's harassment, as he took steps to undermine her supervisory authority, withheld information necessary to her work, and prevented her participation in important training sessions that other staff members attended. Throughout, Daly belittled Gregory, yelled at her, called her stupid, and made vulgar, sexually explicit comments to her.
 
 
 6
 In addition to this harassment, Daly withheld from Gregory raises that other staff members received. Ultimately, in February 1998, Gregory was fired. Daly explained to her that she was unqualified for her position, an accusation Gregory denies.
 
 
 7
 Gregory filed a charge of discrimination (alleging sex discrimination and retaliation) with the EEOC in July 1998. After a right-to-sue letter was issued by the EEOC, this action was timely brought. In due course, defendants moved to dismiss under Rules 12(b)(1) and (6), arguing that plaintiff had failed to state a Title VII[3] claim and that the district court should not entertain this lawsuit while the earlier-filed litigation was still pending in state court.
 
 
 8
 The district court granted defendants' motion under Rule 12(b)(6). See Gregory v. Daly, 78 F. Supp.2d 48 (N.D.N.Y. 1999). In a brief opinion, the court characterized the complaint as containing nothing more than accusations of "'demeaning' comments,'" id. at 49, and as failing to address the factors that, under Harris v. Forklift Systems, 510 U.S. 17 (1993), bear upon whether harassment is sufficiently severe or pervasive to be actionable. The court specifically noted that Daly's comments concerning sexual abuse of children might have been innocuous because they were relevant in the professional context of Gregory's and Daly's roles as caregivers. See 78 F. Supp.2d at 49. And with respect to the claimed denial of pay increases and termination, the district court concluded simply that the "get on board or quit" statement "will not support a Title VII claim despite [plaintiff's] characterization of it as a 'quid pro quo' demand." Id. The court's decision did not address either whether, aside from the "quid pro quo" theory, sex discrimination was the cause of her withheld pay raises and her ultimate termination, or whether any of the harms she allegedly suffered at CAAGC were in retaliation for her workplace complaints or for the state court lawsuit she had brought.
 
 Discussion
 
 9
 We address, in turn, Gregory's allegations that she was (1) subjected to a hostile work environment because of her sex, (2) denied salary increases and then terminated on account of her sex, and (3) retaliated against for challenging what she believed to be discriminatory treatment. For reasons explained below, we treat the facts underlying Gregory's "quid pro quo" allegation in the context of each of these three claims, while rejecting that allegation's viability as a separate cause of action.
 
 
 10
 The district court's decision was made on a Rule 12(b)(6) motion to dismiss. We review that decision de novo and will affirm only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim[s] which would entitle [her] to relief." Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir. 2000) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In making this assessment, we "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Id. Particularly important in this case is the well-established principle, apparently overlooked by the court below, that we include in this analysis not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the pleadings or in documents incorporated by reference. See Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991). Accordingly, we treat Gregory's allegations in the affidavit she submitted to the EEOC as an integral part of her pleadings.
 
 
 11
 Applying these standards, and mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations, seeTarshis, 211 F.3d at 35; Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995), we find that Gregory adequately pleaded each of the three claims set forth above.
 
 I. Hostile Work Environment
 
 12
 Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's... sex." 42 U.S.C. § 2000e-2(a)(1). The phrase "terms, conditions, or privileges of employment" is broad enough to encompass, and render actionable, an employer's requirement that an employee "work in a discriminatorily hostile or abusive environment," so long as the discriminatory conduct at issue is "severe or pervasive enough to create an objectively hostile or abusive work environment." Harris, 510 U.S. at 21. And this is so notwithstanding the fact that the employer takes no "tangible employment action... [that] itself constitutes a change in the terms and conditions of employment" by formally altering a worker's employment status. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998); see also id. at 761-63 (discussing tangible employment actions).
 
 
 13
 Thus, harms suffered in the workplace are cognizable under Title VII, even when they are not the result of "tangible employment actions," if they arise from conduct (1) that is "objectively" severe or pervasive - that is, if it creates "an environment that a reasonable person would find hostile or abusive" [the "objective" requirement], Harris, 510 U.S. at 21, (2) that the plaintiff "subjectively perceive[s]" as hostile or abusive [the "subjective" requirement], id., and (3) that creates such an environment because of plaintiff's sex (or other characteristic protected by Title VII) [the "prohibited causal factor" requirement], see Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (emphasizing that Title VII does not prohibit all workplace harassment, but only that which involves statutorily proscribed forms of discrimination).[4] See generally id. at 78-81; Cruz v. Coach Stores, Inc., 202 F.3d 560, 570-72 (2d Cir. 2000).
 
 A. Hostility of the CAAGC Workplace
 
 14
 CAAGC presents a twofold attack on the adequacy of plaintiff's allegations of a hostile or abusive workplace environment. It argues first that the lion's share of Gregory's contentions are too vague and conclusory to merit consideration, and second that the remaining claims go to behavior that is insufficiently grave to fall within Title VII's purview.
 
 
 15
 The level of specificity necessary to state a claim for Rule 12(b)(6) purposes is governed by the Federal Rules of Civil Procedure's notice pleading principles that call for no more than "a short and plain statement" of a plaintiff's claim. Fed. R. Civ. P. 8(a); see also Conley, 355 U.S. at 47 (emphasizing that the civil rules "do not require a claimant to set out in detail the facts upon which he bases his claim"). Nonetheless, "bald assertions and conclusions of law" are not adequate, Tarshis, 211 F.3d at 35, and "a complaint consisting [only of] naked assertions, and setting forth no facts upon which a court could find a violation of the Civil Rights Acts, fails to state a claim under Rule 12(b)(6)." Yusuf v. Vassar College, 35 F.3d 709, 713 (2d Cir. 1994) (quoting Martin v. New York State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978)).
 
 
 16
 Although it is difficult in the abstract to identify with precision the point at which allegations graduate from "conclusory" to "short and plain," case law makes the operative distinction relatively clear. Thus, in Yusuf we rejected as conclusory the allegation that "race was a motivating factor" absent any "reason to suspect that [the decision in question] had anything to do with [plaintiff's] race." 35 F.3d at 714; but cf. Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir. 1998) ("'I was turned down for a job because of my race' is all a complaint has to say."). But in Yusuf we also accepted, as a sufficient allegation of sex discrimination, a man's claim that men were "historically and systematically" found guilty in disciplinary proceedings, without regard to the weight of the evidence, and we did so even though plaintiff made no reference to any specific examples. 35 F.3d at 716; see also Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997) (concluding that "general allegations of constant abuse" created a jury question as to severity and pervasiveness, "even in the absence of specific details about each incident"). In other words, a simple declaration that defendant's conduct violated the ultimate legal standard at issue (e.g., it was "because of sex" or "severe or pervasive") does not suffice. But it is enough to assert facts from which, construing the complaint liberally and in the plaintiff's favor, one could infer such a violation.
 
 
 17
 Gregory's allegations go well beyond the sort of bare declarations of being "treated poorly on the job and harassed," Simpson v. Welch, 900 F.2d 33, 35 (4th Cir. 1990), that cannot support a hostile work environment claim. For instance, she claims that Daly (a) made demeaning comments about women, (b) made sexually demeaning statements, (c) initiated unwelcome physical conduct of a sexual nature, and (d) intimidated her by "standing uncomfortably close to [her] even though [she] asked him to move away." Gregory further specified that Daly "would call or come to my offices and continually belittle me, using foul language and yell[ing] continually," and that he "made innuendos, vulgar and sexually explicit comments." Although Gregory has proffered neither a verbatim transcript nor a log of dates and times, these allegations were certainly sufficient to put defendants on notice of the nature of the claims against them. See Conley, 353 U.S. at 47. And, especially when supplemented by plaintiff's further references to Daly's specific statements about sexual violence and the particular limitations he placed on her work activities, they are enough to state a case at the pleading stage.
 
 
 18
 Not only are the pleadings sufficiently detailed to state a claim, but, if proven, they establish that plaintiff was required to endure an environment that "objectively" was severely and pervasively hostile. First, looking at the totality of the circumstances rather than to individual events in isolation, seeHarris, 510 U.S. at 23; Cruz, 202 F.3d at 570, we believe that plaintiff could reasonably have found her workplace to be both physically and sexually threatening. Daly's conduct allegedly combined verbal abuse, ostentatious and graphic references to sexual assault and women's vulnerability to it, and intimidating physical behavior.[5] See Cruz, 202 F.3d at 571 (concluding that a hostile work environment claim survived summary judgment where a supervisor looked at women "up and down in a way that [was] very uncomfortable" and would move toward plaintiff until she was backed against a wall, and holding that this "physically threatening" behavior crossed "the line separating merely offensive or boorish conduct from actionable sexual harassment"). Second, Daly allegedly took steps, such as undermining Gregory's supervisory authority and depriving her of necessary training, that directly interfered with her ability to do her job. Cf. Howley v. Town of Stratford, 217 F.3d 141, 154-56 (2d Cir. 2000) (holding that conduct "diminishing the respect accorded [plaintiff] by subordinates and thereby impairing her ability to lead" can, in appropriate circumstances, contribute to a hostile work environment); Carrero v. New York City Housing Auth., 890 F.2d 569, 579 (2d Cir. 1989) (noting that denying plaintiff "adequate training" contributes to a hostile work environment in which plaintiff is deprived "of a fair and equal opportunity to succeed at her position"). Finally, by allegedly rejecting Gregory's complaints with the demand that she "get on board or quit," Daly made it clear that his harassing conduct was anything but a joke, and that accepting it was something that Gregory should consider integral to her job. Regardless of whether Daly ultimately made decisions about tangible employment actions based on whether Gregory "got on board," threatening such a linkage can contribute to creation of a hostile work environment. See Burlington Indus., 524 U.S. at 753 (distinguishing between making threats and carrying them out); cf. E.E.O.C. v. Farmer Bros. Co., 31 F.3d 891, 897-98 (9th Cir. 1994) (noting that a woman "forced to tolerate [a supervisor's] sexually harassing conduct for fear that her job or her advancement in the company are at risk... may reasonably feel subordinated and belittled").
 
 
 19
 We conclude that the environment alleged to have been created is just the sort that "can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers," contrary to "Title VII's broad rule of workplace equality." Harris, 510 U.S. at 22.[6] We therefore hold that Gregory's allegations provided ample basis for a determination that that her work environment at CAAGC "would reasonably be perceived... as hostile or abusive," Harris, 510 U.S. at 22, i.e. that the objective requirement in Harris is met.[7]
 
 B. The Role of Plaintiff's Sex
 
 20
 CAAGC also argues that Gregory failed to plead a sufficient connection between her sex and Daly's harassing conduct and thereby failed to meet the prohibited causal factor requirement of Title VII. Nothing in our Title VII jurisprudence, however, requires a plaintiff to append to each allegation of harassment the conclusory declaration "and this was done because of my sex." Instead, what is needed is the allegation of factual circumstances that permit the inference that plaintiff was subjected to a hostile work environment because of her sex. See Oncale, 523 U.S. at 80-81.
 
 
 21
 Here, Gregory has asserted that Daly made specific references to women as easy victims of sexual assault, added generally demeaning remarks about women, and wove vulgar and sexually explicit language into his tirades against her. Moreover, some of his actions could perhaps be construed as pressure to engage in sexual activity with him. Plaintiff's allegations, when taken in the light most favorable to her, thus hardly leave it "beyond doubt that [she] can prove no set of facts," Tarshis, 211 F.3d at 35, establishing that her sex, in one way or another, played a substantial role in Daly's behavior. See Oncale, 523 U.S. at 80-81 (discussing different forms of evidence that may show sex discrimination); Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463 (9th Cir. 1994) (holding that a reasonable jury could find discrimination based on sex where the harassment in question "relied on sexual epithets [and] offensive, explicit references to women's bodies and sexual conduct").
 
 
 22
 CAAGC contends that we must exclude from consideration those among Gregory's allegations that do not, on their face, contain any connection to sexual behavior or to a person's sex. On appellee's view, Daly's accusations that Gregory was stupid and incompetent could not be a vehicle for sex discrimination because the same charges might have been leveled at a man. Similarly, CAAGC's approach would have us exclude Daly's interference with Gregory's training, supervision, and other work-related activities. This argument, however, misconceives the inquiry. The fact that both men and women can be fired or demoted tells us nothing about whether, in any particular instance, an employee's sex was a factor in such an action. The relevant question therefore becomes whether, in the given case, the pleading suffices to support an ultimate finding that the alleged harasser acted as he did because of the plaintiff's sex.
 
 
 23
 As a result, when plaintiffs allege discriminatory tangible employment actions, we routinely look to a wide variety of (often subtle) indications that a consideration prohibited by Title VII played a role in the employer's conduct. And the absence of any direct evidence of discriminatory intent does not by itself defeat the suit. See, e.g., Tarshis, 211 F.3d at 35-36 (observing that employment discrimination plaintiffs "more often than not must depend on the cumulative weight of circumstantial evidence"); Chertkova v. Connecticut Gen. Life Ins., Co., 92 F.3d 81, 91 (2d Cir. 1996) (cataloging circumstances that may give rise to an inference of discrimination).
 
 
 24
 The same principles apply just as much to allegations of discrimination through subjection to a hostile work environment. As the Supreme Court said in Oncale, neither "sex-specific and derogatory terms" nor any evidence that "sexual desire" motivated the harassment is needed to prove an actionable hostile work environment. 523 U.S. at 80-81. Similarly, this court has found workplace situations discriminatory under a hostile work environment theory where the conduct at issue, though lacking any sexual component or any reference to the victim's sex, could, in context, reasonably be interpreted as having been taken on the basis of plaintiff's sex. See Howley, 217 F.3d at 145, 148, 154-55 (acts of insubordination, dissemination of untrue rumors about plaintiff, and aspersions on her competence each contributed to a hostile work environment, based on sex, where plaintiff was the only woman among 100 firefighters and other harassing conduct referred to her performance of sexual acts on men); see also O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001) ("Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment...."); Williams v. General Motors Corp., 187 F.3d 553, 565 (6th Cir. 1999) (adopting the proposition that "the conduct underlying a sexual harassment claim need not be overtly sexual in nature" and stating that "[a]ny unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the Harris standard, constitute a hostile environment in violation of Title VII"); see generally Vicki Schultz, Reconceptualizing Sexual Harassment, 107 Yale L.J. 1683 (1998) (criticizing some courts' emphasis on harassing conduct relating to sexuality and arguing for the centrality to hostile work environment analysis of conduct that, though not concerned with sexual activity, is based on a person's sex). Here, the sex-based character of much of Daly's behavior permits the inference that the remainder of his harassing conduct was also due to Gregory's sex. And this remains so even though the discriminatory character of some individual incidents might not be evident were they considered in isolation only.
 
 
 25
 Because Gregory's allegations support the notion that she was subjected to abusive working conditions because of her sex, we vacate the district court's judgment dismissing plaintiff's claim of hostile work environment discrimination.
 
 II. Pay Raise and Termination
 
 26
 Gregory also alleges that CAAGC engaged in sex discrimination by denying her pay raises and by terminating her employment. Plaintiff may make out a prima facie case of discrimination with respect to these tangible employment actions by alleging (1) her membership in a protected class, (2) her qualification for the job benefit at issue, (3) that she was subjected to adverse employment actions, and (4) that these actions were taken "under circumstances giving rise to an inference of discrimination." Austin, 149 F.3d at 152; accord Tarshis, 211 F.3d at 36. Appellees challenge the sufficiency of plaintiff's showing as to points (2) and (4).
 
 
 27
 A. Qualification for the Employment Benefits At Issue
 
 
 28
 As appellees correctly point out, the question of Gregory's qualifications for her job receives little explicit attention in her pleadings, except in her allegation that "Mr. Daly fired me from my position claiming that I was not qualified for such position which was untrue." Gregory did, however, make other allegations directly relevant to the question of her qualifications. In particular, she claims that she had worked at CAAGC for ten years and had been promoted repeatedly.
 
 
 29
 It is true that, in some circumstances, a plaintiff's failure to plead with some specificity her qualification for the position in question may prevent her from making out a prima facie case of discrimination. Thus, in Cruz v. Coach Stores we dismissed a claim of discriminatory non-promotion on the ground that the complaint contained "no information about either the responsibilities of [the position in question] or [plaintiff's] employment skills, information that might have supported the inference that [plaintiff] was fit for the position." Cruz, 202 F.3d at 566.
 
 
 30
 But the sufficiency of a plaintiff's pleadings of qualification for the job benefit that was allegedly denied through discrimination must be analyzed in a manner that is consistent with the role that qualifications play within the burden-shifting approach established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and subsequent cases. In particular, we have long emphasized that the qualification prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision. See Powell v. Syracuse Univ., 580 F.2d 1150, 1155 (2d Cir. 1978). To show "qualification" sufficiently to shift the burden of providing some explanation for discharge to the employer, the plaintiff "need not show perfect performance or even average performance." Id. at 1155 (quoting Flowers v. Crouch Walker Corp., 552 F.2d 1277, 1283 (7th Cir. 1977)). Instead, she need only make the "minimal showing" that "she 'possesses the basic skills necessary for performance of [the] job.'" Owens v. New York City Housing Auth., 934 F.2d 405, 409 (2d Cir. 1991) (quoting Powell, 580 F.2d at 1155) (emphasis added); accord De La Cruz v. New York City Human Res. Admin. Dep't of Social Servs., 82 F.3d 16, 20 (2d Cir. 1996).
 
 
 31
 The role of the qualification prong is simply to help "eliminate[] the most common nondiscriminatory reasons for the plaintiff's rejection." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); see also Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977) ("[T]he McDonnell Douglas formula... demand[s] that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought."). It cannot be more than that.
 
 
 32
 In a discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified. Moreover, when, as in this case, the employer has retained the plaintiff for a significant period of time and promoted her, the strength of the inference that she possesses the basic skills required for her job is heightened. An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action. But the crucial point remains the same: the qualification prong, as to which the initial burden lies on plaintiff, cannot be transformed into a requirement that the plaintiff anticipate and disprove an employer's explanation that inadequate ability or performance justified the job action at issue.[8] This principle is especially important in the context of a Rule 12(b)(6) motion, where what is at stake is whether the plaintiff gains the opportunity to demand such an explanation from the employer and to conduct discovery with respect to it, among other things.
 
 
 33
 Here, Gregory alleged that CAAGC retained her services for ten years and promoted her into successively higher positions, and that Daly's accusations of her lack of qualifications, rather than being true, were instead part of a campaign of discrimination against her.[9] These assertions suffice to plead her qualification for the position.[10]
 
 
 34
 B. Circumstances Suggesting Sex Discrimination
 
 
 35
 In this case, the same circumstances suggesting that a hostile work environment was created by Daly because of Gregory's sex also give rise to the inference that the tangible adverse employment decisions made by him were based on Gregory's sex. See Pitre v. Western Elec. Co., Inc., 843 F.2d 1262, 1270 (10th Cir. 1988) ("Evidence of harassment... helps create an inference of discrimination in [the employer's] promotion and demotion practices."). Indeed, we have long recognized that "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus" may "give rise to an inference of discriminatory motive." See Chertkova, 92 F.3d at 91 (citing Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992)). And this is no less true when those same remarks also contribute to the creation of a hostile work environment. Sex-based hostility to a woman's continued presence in the workplace, or to particular roles within it, does not necessarily stop at the doctrinal boundary between creation of a hostile work environment and imposition of more tangible employment injuries. See Farmer Bros. Co., 31 F.3d at 898 ("Because hostility against women underlies decisions to discharge or to refuse to hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender based employment discrimination.") The case before us demonstrates the point. Gregory's pleadings allege a continuous, escalating pattern of conduct that began with insulting and ominous talk and then increasingly took the form of concrete interference with her job functions (all of which was serious enough to constitute a hostile work environment), and finally culminated in tangible employment actions, including her termination.
 
 
 36
 Moreover, the pleadings in this case contain a specific allegation that Daly himself made a link between his harassing behavior and Gregory's continued employment: the "get on board or quit" remark allegedly made in response to her complaints. The exact meaning of the remark is far from clear, but there are two interpretations of it that, given the context in which it allegedly was made, lend support to the notion that Gregory's sex played a role in her discharge. First, Daly might have been communicating that, in order to continue her employment, Gregory would have to acquiesce in and affirmatively adopt a workplace role in which, because of her sex, she would be the butt of certain forms of ridicule, bullying, and diminished professional responsibilities. Second, and less likely, he might have been insinuating that her future at CAAGC depended on her response to sexual advances by Daly, advances which, for these purposes, we may assume would not have been made but for her sex, see Oncale, 523 U.S. at 80. In either case, and after drawing all reasonable inferences that support plaintiff's claim, the remark lends support to the notion that Gregory's sex played a significant causal role in the chain of events leading to her termination. See Austin, 149 F.3d at 155 (holding that, where an employee refused to work overtime under adverse conditions imposed because of race and age, termination for refusal to comply with discriminatory conditions was itself discriminatory); cf. Gallagher v. Delaney, 139 F.3d 338, 346 (2d Cir. 1998) ("A jury could find, based on its cumulative perceptions and backgrounds, that requests for sexual activity are not always made explicitly, and that [a supervisor's] failure to directly demand sexual favors as a condition of [plaintiff's] continued terms of employment did not negate indirect pressure.") And this is so even if we assume that, in the absence of other indications that Daly harbored sex-based hostile and negative attitudes regarding Gregory's role in the workplace, Daly's comment would not on its own to give rise to a sufficiently strong inference of discrimination, under either interpretation, to make out a prima facie case.
 
 C. The "Quid Pro Quo" Theory
 
 37
 We have treated Gregory's contention that, because of her sex, Daly "linked tangible job benefits to the acceptance or rejection of [a] sexual advance[]," Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir. 1994), as one factual allegation that would, if proven, support her claim that she was denied pay raises and terminated on account of her sex, rather than as an independent "claim" of what has often been called a separate "quid pro quo harassment" cause of action. We believe that this is the appropriate approach in light of recent developments in sexual harassment doctrine. In this respect, we take particular note of the Supreme Court's current emphasis on the fact that traditional categories of "hostile work environment" and "quid pro quo" harassment do not reflect statutory proscriptions that separate "harassment" from other forms of discrimination. Rather, the high Court has indicated that these labels, to the extent that they are useful at all, are so merely as descriptions of varying workplace conditions that violate Title VII's basic prohibition on sex discrimination in terms or conditions of employment. SeeBurlington Indus., 524 U.S. at 751-52; Oncale, 523 U.S. at 78-81. Indeed, in Burlington Industries, the Court gave primary importance only to one distinction, namely that between employer conduct that leads to tangible employment actions and the more informal imposition of adverse terms or conditions of employment that result in a hostile or abusive workplace. See Burlington Indus., 524 U.S. at 751-53; see also Mosher v. Dollar Tree Stores, Inc., 240 F.3d 662, 666 (7th Cir. 2001).
 
 
 38
 So viewed, a "quid pro quo" allegation merely makes a factual claim about the particular mechanism by which a plaintiff's sex became the basis for an adverse alteration of the terms or conditions of her employment. See Burlington Indus., 524 U.S. at 753-54 ("When a plaintiff proves that a tangible employment action resulted from refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."); Carrero, 890 F.2d at 579 ("Carrero's refusal to submit to sexual demands and her complaints against Peterson resulted in deficient training, an unfair evaluation of her work, and a subsequent demotion."). Of course, if proven, such behavior manifestly violates Title VII. But it does so because a sexual quid pro quo constitutes a specific and egregious example of an employer taking adverse employment actions that penalize an employee's refusal to comply with a discriminatory condition of employment. And such actions are themselves discriminatory. See Austin, 149 F.3d at 155.
 
 
 39
 The law does not create separate causes of action for sex discrimination depending on the reason the employer denies a woman a job or a job benefit. It does not, for instance, delineate distinct claims for employers who dislike women, doubt their abilities, demand that they conform to sex stereotypes, or want their policies to reflect actuarial differences between the sexes.[11] What matters, instead, is simply whether an employment action was based on plaintiff's sex. Similarly, there is no reason to create a separate doctrinal category for employers who make women's workplace success contingent on submission to a supervisor's sexual demands. For such a sexual quid pro is just another way in which an employer, in violation of Title VII, makes an employee's sex relevant to an employment decision. See Johnson Controls, 499 U.S. at 199 (holding that whether an employment practice is based on sex "does not depend on why the employer discriminates"); E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1283 (11th Cir. 2000) (same).
 
 
 40
 As a result, a plaintiff seeking to demonstrate sex discrimination is not required to disentangle various threads that, after all, need not have a separate existence, given that various forms of discrimination may well co-exist in a workplace. Thus, a jury might find it more plausible that a supervisor would be willing to fire a woman for refusing a sexual advance if it also had reason to think that he discounted women's abilities to be productive workers. Or it might conclude that his request for a quid pro quoreflected an insistence that women relate to men according to sexual stereotypes rather than as co-workers. And these considerations may well, in combination, demonstrate that the employee's sex played a sufficient causal role, as to result in Title VII liability. This could be so, moreover, even though, in isolation, no single way in which sex influenced the employer's decision sufficed to warrant that conclusion. See Howley, 217 F.3d at 151 ("[T]he court should not consider the record solely in piecemeal fashion, giving credence to innocent explanations for individual strands of evidence, for a jury, in assessing whether there was impermissible discrimination... would be entitled to view the evidence as a whole.")In the case before us, plaintiff's allegations suggest an interconnection between Daly's acts of possible sexual intimidation (including his comments about rape and his threatening manner of approaching Gregory) and his derogation of her work competence. See Farmer Bros., 31 F.3d at 897-98 (explaining that "sexual harassment may be symptomatic of gender based hostility, the employer or supervisor using sexual harassment primarily to subordinate women, to remind them of their lower status in the workplace, and to demean them," rather than exclusively "in order to gratify his sexual desires"). And this is so, although we very much doubt that the "get on board or quit" remark would, on its own, support any cause of action.
 
 
 41
 In sum, when allegations of a sexual quid pro quo co-exist with allegations of other circumstances suggesting that the challenged employment actions were taken because of plaintiff's sex, we look to the totality of the circumstances to determine whether there is a sufficient basis to infer sex-based discrimination. See Chertkova, 92 F.3d at 91. We do not disaggregate mutually supportive assertions that plaintiff's sex played a significant causal role in the decision at issue; nor do we treat each as a distinct claim that must separately possess a firm enough basis to survive a challenge at pleading or summary judgment. See Howley, 217 F.3d at 151; Stern v. Trustees of Columbia Univ., 131 F.3d 305, 314 (2d Cir. 1997).
 
 
 42
 This approach is not only consistent with how evidence is considered in the law generally, but it is especially desirable in this area. For it helps avoid distracting inquiries into whether a supervisor's statement really proposed a sexual quid pro quo, and focuses the analysis on the core question posed by Title VII: whether plaintiff's sex played a role in the actions at issue. See Eugene Scalia, The Strange Career of Quid Pro Quo Sexual Harassment, 21 Harv. J.L. Pub. Pol'y 307, 319 (1998); cf. Burlington Indus., 524 U.S. at 753-54 (criticizing use of the hostile work environment/quid pro quo distinction as a proxy for deciding when employers are subject to vicarious liability for employment discrimination).
 
 
 43
 For these reasons, while we are more than skeptical that Gregory could state a claim based solely on her allegation that the "get on board or quit" remark reflected a sexual demand the refusal of which underlay her lost pay raises and termination, we do not deem that to be the only relevant question. Instead, we consider the allegation as one bit of evidence that is germane to her McDonnell Douglas prima facie case of discriminatory pay and discharge.
 
 III. Retaliation
 
 44
 Although the district court did not mention it, Gregory also asserts a Title VII claim of retaliation.[12] See 42 U.S.C. § 2000e-3(a). "To establish a prima facie case for retaliation, a plaintiff must show that (1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996).
 
 
 45
 "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management," Matima v. Celli, 228 F.3d 68, 78 (2d Cir. 2000) (internal quotation marks omitted), so long as the employee has "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." Quinn, 159 F.3d at 769 (internal quotation marks and emphasis omitted). Here, Gregory's oral and written complaints about Daly's behavior, as well as her filing of a lawsuit in state court, were undoubtedly forms of protected activity. And, given our holding that the facts she alleges support a hostile work environment claim of sex discrimination, it follows that she could reasonably have believed that Daly's conduct violated Title VII.
 
 
 46
 Nor can there be any doubt that she has adequately alleged adverse employment actions against her, in the denied pay raises, in her termination, and also in Daly's harassing behavior. For we apply the same standards in determining whether retaliatory harassment constitutes an adverse employment action as we do in assessing whether harassment imposed because of sex works an actionable alteration in the terms or conditions of employment. See Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999) (holding that retaliatory harassment may constitute an actionable "adverse employment action" if it works a "materially adverse change in the terms and conditions of employment" (internal quotation marks omitted)); see also Ray v. Henderson, 217 F.3d 1234, 1244-45 (9th Cir. 2000).
 
 
 47
 Of course, in examining the sufficiency of Gregory's pleadings of retaliation, we must omit from consideration those episodes of harassment that preceded her protected activity (i.e., her workplace complaints and state court lawsuit), since prior harassment could not have been in retaliation for acts not yet taken. But, given that Gregory first complained about Daly's conduct soon after the alleged harassment began and nearly a year before she was terminated, and that she alleges that the environment significantly worsened after she complained and filed suit, excluding Gregory's initial encounters with Daly does not alter, for purposes of her retaliation claim, our previous conclusion that she has alleged an actionably hostile work environment.
 
 
 48
 Lastly, Gregory's pleadings provide an ample basis for inferring that the hostile work environment, withheld salary increases, and termination were causally connected to her protected activity. Not only are the actions complained of proximate in time to the protected activity, see Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988) ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); Quinn, 159 F.3d at 769, but Daly allegedly intensified his harassment in response to Gregory's complaints. Moreover, he responded to these complaints with the specific warning that she should "get on board or quit," and he made "sneering comments" about her lawsuit. These facts suffice to support an inference of retaliatory animus.[13]
 
 IV. The Parallel State Court Proceeding
 
 49
 CAAGC argues that even if Gregory states Title VII claims, we should nonetheless affirm the district court on the alternative ground that it should have declined to exercise its jurisdiction in light of Gregory's filing of a similar lawsuit in New York State court. See McNally Wellman Co. v. New York State Elec. & Gas Corp., 63 F.3d 1188, 1194 (2d Cir. 1995) ("We need not affirm for the reasons expressed by the district court but may affirm on any ground supported by the record."). Because the parties fully addressed the significance of the state court suit in the briefing below and on appeal, we consider, and reject, CAAGC's argument.
 
 
 50
 Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), and its progeny, which set forth the standards governing abstention when "state and federal courts exercise concurrent jurisdiction simultaneously," Village of Westfield, N.Y. v. Welch's, 170 F.3d 116, 120 (2d Cir. 1999) (internal quotation marks omitted), are controlling. These cases hold that the mere fact that parallel proceedings are pending in state court is insufficient to justify abdicating the "virtually unflagging obligation," Colorado River, 424 U.S. at 817, to exercise federal jurisdiction. See Village of Westfield, 170 F.3d at 120; American Disposal Servs., Inc. v. O'Brien, 839 F.2d 84, 87 (2d Cir. 1988) ("[T]he existence of concurrent federal and state proceedings regarding the same subject matter is not by itself sufficient to justify dismissal under Colorado River."). To justify abstention, there must be "exceptional circumstances." Colorado River, 424 U.S. at 813.
 
 
 51
 Here, CAAGC rests its argument on the bare fact that allowing this case to proceed will result in the maintenance of duplicative proceedings; it has identified none of the considerations that suggest the requisite "exceptional circumstances," such as the danger of conflicting remedies[14] or a party's initiation of a second suit after receiving a preliminary adverse ruling on the merits in the first suit.[15] Accordingly, it is plain that, on the current record, abstention is inappropriate, and there is no need to analyze in detail the factors that we have identified as relevant to deciding closer cases. See Village of Westfield, 170 F.3d at 121.
 
 Conclusion
 
 52
 To summarize, we hold that plaintiff has stated claims for both sex discrimination and retaliation with regard to her alleged subjection to a hostile work environment, the denial of pay raises, and her termination. Accordingly, while we AFFIRM the district court's decision to dismiss plaintiff's claims against Daly, we VACATE the judgment insofar as it dismisses plaintiff's claims against CAAGC, and REMAND for further proceedings consistent with this opinion. CAAGC shall bear Gregory's appellate costs.
 
 
 
 NOTES:
 
 
 [1]
 It is plain that Daly is not a proper defendant in this action. See Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995) (holding that individual supervisory employees may not be held liable under Title VII).
 
 
 [2]
 Gregory and three other female CAAGC employees claimed, under New York law, sex discrimination in employment and intentional infliction of emotional distress; their husbands claimed loss of consortium. The state court complaint alleges essentially the same facts as the later EEOC charge and complaint in this case.
 
 
 [3]
 Gregory's complaint asserts claims under both Title VII and the New York Human Rights Law, N.Y. Exec. Law § 296. Because New York law follows the federal lead in this area, see Walsh v. Covenant House, 664 N.Y.S.2d 282, 283 (1st Dep't 1997); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1177 (2d Cir. 1996), we do not discuss the state claims separately.
 
 
 [4]
 For liability to attach, the employer must also be responsible for the conduct at issue. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998). The relevant standards and burdens pertaining to employer liability vary with the circumstances, see id. (comparing the standards applicable to harassing conduct committed by customers, co-workers, and supervisors), and are not at issue in this case.
 
 
 [5]
 The district court's speculation that Daly's discussion of child sexual abuse might have been appropriate in the context of his and Gregory's jobs as caregivers, while not implausible, especially when considered in isolation from the rest of plaintiff's allegations, was not the interpretation of the pleadings most favorable to plaintiff. It was, therefore, a totally inappropriate basis for dismissal at this stage in the litigation.
 
 
 [6]
 CAAGC argues that Gregory's pleadings are insufficient because they fail to address the factors that the Supreme Court in Harris listed as relevant to assessing whether workplace harassment rises to an actionable level. The Court in Harris explained that, though not reducible to "a mathematically precise test,"
 whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.
 510 U.S. at 22-23. But this passage is plainly meant simply to illustrate the sorts of considerations that courts should take into account in evaluating allegations of a hostile work environment. It does not impose a rigid multi-pronged test around which a plaintiff must structure her pleadings. In any event, even though Gregory did not label her claims with headings drawn from Harris, they do, as explained in text, exhibit many of those very features Harris identified as indicative of an actionable work environment.
 
 
 [7]
 There is no dispute that the work environment was perceived by Gregory as hostile or abusive, i.e. that she subjectively experienced it that way.
 
 
 [8]
 Of course, there will also be circumstances in which a plaintiff's performance is so manifestly poor as to render her unqualified for continued employment and thereby defeat her prima facie case. See, e.g., McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) (concluding, in the summary judgment context, that no prima facie case had been made out where, after a probationary period, the employer rated plaintiff's work unsatisfactory on a majority of criteria and plaintiff did not contest most of these ratings).
 
 
 [9]
 Although appellees do not specifically challenge Gregory's qualification for a pay raise, we note that she alleges that the raise in question had previously been approved and that other employees did receive raises.
 
 
 [10]
 Of course, it follows from the de minimis character of the qualification requirement in the prima facie case that, even were Gregory ultimately to prove her qualifications for the purposes of her prima facie case, she might nonetheless fail to prove (should the defendant bring forth evidence of deficient performance) that discrimination was the basis for CAAGC's adverse decisions.
 
 
 [11]
 Compare, e.g., International Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 197 (1991) (finding that employer engaged in intentional sex discrimination where "[f]ertile men, but not fertile women, are given a choice as to whether they wish to risk their reproductive health for a particular job"); City of Los Angeles, Dep't of Water and Power v. Manhart, 435 U.S. 702, 708-11 (1978) (holding that it violates Title VII to require higher pension contributions from women, even though "[w]omen, as a class, do live longer than men"); id. at 707 ("Myths and purely habitual assumptions about a woman's inability to perform certain kinds of work are no longer acceptable reasons for refusing to employ qualified individuals, or for paying them less."); Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989) (Brennan, J.) (plurality opinion) ("[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."); id. at 272-73 (O'Connor, J., concurring in the judgment) (characterizing "failure to conform to [gender] stereotypes" as a discriminatory criterion); and Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1237, 1239 (2d Cir. 1995) (holding that plaintiff presented "sufficient direct evidence of gender discrimination" to survive summary judgment where supervisor said that women were "basically... on the earth for fucking purposes only" and referred to female employees as "a bunch of dumb cunts").
 
 
 [12]
 Gregory's complaint does not contain a separate count charging retaliation, but both retaliation and sex discrimination are marked on her EEOC charge, and she has argued that she states a claim for retaliation in her briefing below and in this appeal. Because in both courts CAAGC has joined issue on the merits of the retaliation claim based on the facts alleged in the pleadings, and has not asserted that the complaint failed to put it on notice that Gregory was alleging a retaliation claim, CAAGC has waived any defense it might have had based on the absence of a separate retaliation count in the complaint. See Cruz, 202 F.3d at 569-70 & n.5.
 
 
 [13]
 We note that, at the 12(b)(6) stage, Gregory may maintain claims based on mutually exclusive inferences from the facts alleged. See Fed. R. Civ. P. 8(e)(2) ("A party may... state as many separate claims or defenses as the party has regardless of consistency...."); Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999) ("The flexibility afforded by Rule 8(e)(2) is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims." (internal quotation marks omitted)). Thus, it is unnecessary at this stage of the litigation to examine the extent to which the various facts alleged, such as the "get on board or quit" remark, can support inferences of both retaliatory and discriminatory intent, or only one or the other. Similarly, we need not decide whether, for Title VII purposes, it is possible for the adverse actions complained of to be caused by both retaliation and sex discrimination.
 
 
 [14]
 See, e.g., Colorado River, 424 U.S. at 819 (emphasizing policy of "avoiding the generation of additional litigation through permitting inconsistent dispositions of property"); cf. Spring City Corp. v. American Buildings Co., 193 F.3d 165, 172 (3d Cir. 1999) (noting that the fact of parallel proceedings does not in and of itself create a risk of conflicting outcomes because "[t]he general rule regarding simultaneous litigation of similar issues in both state and federal courts is that both actions may proceed until one has come to judgment, at which point that judgment may create a res judicata or collateral estoppel effect on the other action" (internal quotation marks omitted)).
 
 
 [15]
 See American Disposal Servs., 839 F.2d at 88; Telesco v. Telesco Fuel and Masons' Materials, Inc., 765 F.2d 356, 363 (2d Cir. 1985).