**Francesco GALLO, Plaintiff,**

v.

**ALITALIA—LINEE AEREE ITALIANE—SOCIETA PER AZIONI, Pierandrea Galli, and Giulio Libutti, Defendants.**

**No. 07 Civ. 06418(CM)(RLE).**

United States District Court, S.D. New York.

Nov. 5, 2008.

Derek Todd Smith, Akin & Smith, LLC, New York, NY, for Plaintiff.

Alan M. Koral, Charles Spencer Caranicas, Vedder, Price, Kaufman & Kammholz, P.C., Chicago, IL, for Defendants.

## DECISION ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

McMAHON, District Judge:

### Introduction

Plaintiff, Francesco Gallo ("Gallo"), is a former employee of defendant Alitalia—Linee Aeree Italiane—Societa per Azioni ("Alitalia"). Alitalia is the national airline of Italy and is headquartered in Rome, Italy; it is licensed to do business in New York. Gallo began working for Alitalia in 1968 as an accountant. During the course of his employment at Alitalia, Gallo rose in rank and, in 2002, became Senior Vice President of Corporate Affairs for North America.

On September 15, 2005, plaintiff and Alitalia entered into an agreement ("the Agreement") that ended Gallo's "regular employment" with Alitalia but made him a "Consultant." [1] (Koral Aff. Ex. 5 ¶¶ 1, 3

---

1. The plaintiff contends that he was still an employee at Alitalia despite the language con- tained in the Agreement.

(hereinafter Sept. 15, 2005 Agreement).) The Agreement made plaintiff a consultant to Alitalia for an irrevocable term of eighteen months, to be automatically renewed for a successive eighteen months unless Alitalia cancelled the consultancy within six months "before the end of the term in effect at the time." [2] (*Id.*)

In May of 2006, Alitalia—through individual defendants Pierandrea Galli ("Galli") and Giulio Libutti ("Libutti") (collectively, "individual defendants")—informed plaintiff that the Agreement would not be renewed. Plaintiff's claims in this case are based on events that occurred after he entered into the Agreement.

Plaintiff alleges that Alitalia, Galli and Libutti (collectively, "the Defendants") engaged in a series of discriminatory practices against him, both while he worked for Alitalia as a consultant and when the Agreement was not renewed. The bulk of plaintiff's problems began when he became a consultant for Alitalia and reported to a new direct supervisor, defendant Libutti.[3] Plaintiff alleges that Libutti—on a daily basis—asked him about his perceived sexual orientation and made crude and discriminatory comments about gays and lesbians. In some instances, Libutti's conduct purportedly resulted in physical confrontations with plaintiff.

For example, during a business teleconference in December 2005, Libutti, who was not in the office, allegedly asked plaintiff, "How are all the froci[4] at Alitalia? ... Since I'm not there, you must be very busy taking it in the ass. Try to be good ... Think what would happen if your wife

would find out!" (Am.Compl. ¶ 41.) Upon Libutti's return to the office, plaintiff went to Libutti's office and told him that he did not appreciate his conduct during the teleconference and that such conduct needed to stop immediately. In response, plaintiff claims that Libutti grabbed his arm, closed the office door and yelled:

> "sit down on this fucking chair, and listen to me carefully, or I will break your ass ... oh no, no you might like that very much, but listen to me once and for all: as you should know by now, I am a real and convinced fascist, like your friend Mazzucco, [sic] I hate with all my passion gays, lesbians, Jews, and all these fucking Americans [sic] attorneys, [sic] that protect them. Now I understand why you negated your Italian citizenship and became one of them. Do you think that I don't know that you rushed to become an American, in order to fuck my strategy?"

(Am.Compl. ¶ 42.)

Plaintiff claims that on the day after this confrontation, he informed defendant Galli[5] of the incident and told him that Libutti had made the working conditions at Alitalia unbearable. Plaintiff claims that Galli subsequently discussed the incident with Libutti, and afterward told plaintiff, "I can assure you, [sic] that it is all in your imagination, Giulio [Libutti] loves you, and he needs your professionalism and capabilities to solve the company's problems. Is it possible that with your health conditions, you are making this up?" (*Id.* ¶ 43.)

---

**2.** The Agreement divided the consultancy into three six-month terms. (Sept. 15, 2005 Agreement ¶ 3)

**3.** Libutti was the Senior Vice President of Sales for North America and Mexico.

**4.** Froci is a pluralized Italian slang term used to describe someone who is gay. Its connota-

tion is supposedly worse than the American slang term, "faggot." The Italian singular is frocio.

**5.** Galli was the Senior Vice President of Worldwide Sales. Before plaintiff became a consultant, he reported directly to Galli.

Plaintiff asserts that the incident described above was only an example of the type of discriminatory practice and hostile work environment he suffered while he worked at Alitalia. During this time period, the Defendants allegedly discriminated against older workers, gays, the disabled and Americans. Plaintiff contends that he vigorously opposed such discrimination, and as a result of both the Defendants' discriminatory practices and in retaliation for opposing them, the Defendants' fired plaintiff in May 2006.

Once Defendants purportedly fired Gallo, plaintiff claims that they also slandered him and breached the Agreement.

Plaintiff did not file a charge of discrimination against Alitalia or the individual defendants with the EEOC. Instead, he brought suit under the New York State Executive Law section 296 and the New York City Human Rights Law section 8–107, alleging hostile work environment, discriminatory termination and retaliation. Additionally, he sued for claims in defamation and breach of contract. This entirely nonfederal suit is here as a diversity case. The Defendants deny all of plaintiff's claims and move for summary judgment dismissing all of them.

For the reasons set forth below, each defendant's motion is granted in part and denied in part.

### Facts

The Court begins by noting that plaintiff has failed to comply with Local Rule 56.1. The purpose of the rule is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. *See Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir.2000); *Watt v.*

*New York Botanical Garden*, 2000 WL 193626, at *1 n. 1 (S.D.N.Y. Feb.16, 2000). To that end, the plaintiff's obligation under Local Rule 56.1(b) in responding to a defendant's statement under Local Rule 56.1(a) is clear:

> The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party ...

Local Rule 56.1(c) is equally clear in setting forth the consequences of the plaintiff's failure to comply with Local Rule 56.1(b):

> Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

In the present case, the Defendants, as the moving party, submitted a 61–paragraph statement of allegedly undisputed facts pursuant to Local Rule 56.1(a). Plaintiff responded with a 15–paragraph "counter-statement" of undisputed facts that apparently corresponds to the numbered paragraphs that the Defendants submitted.[6] Notably, the "counter-statement" bears little relation to the numbered paragraphs in Defendants' Rule 56.1 statement, and for the most part cites only plaintiff's own affidavit as evidence in support of his own Rule 56.1 statement.[7] Indeed, plaintiff's submission can hardly be deemed a response to Defendants' statement since plaintiff neither admits nor de-

---

**6.** Plaintiff's 15 paragraph statement is numbered as follows: 8, 9, 10, 11, 16, 18, 19, 30, 31, 36, 42, 43, 44, 48 and 56.

**7.** Only paragraphs 9, 42, 44 and 48 cite to evidence other than plaintiffs affidavit.

nies a single fact asserted by the Defendants.

Based on plaintiff's failure to comply with Rule 56.1, Defendants urge this court to deem each of the facts asserted in its Rule 56.1 statement admitted to the extent they are not addressed by plaintiff's counter-statement. (Def. Alitalia Reply Mem. at 2.). Defendants' further assert that the plaintiff's failure to follow Rule 56.1 means that the Defendants' reply brief "need address only issues that are addressed in Plaintiff's 'Counter-statement of Undisputed Facts.'" (*Id.*) For the reasons stated below, the Court deems the facts asserted in Defendants' Rule 56.1 statement admitted, but will independently review the record for evidence supporting claims that Defendants' Rule 56.1 statement does not address.

■ A district court has broad discretion in determining whether to overlook a party's failure to comply with local court rules. *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). Specifically, while a court "is not required to consider what the parties fail to point out" in their Local Rule 56.1 statements, it may in its discretion opt to review the record independently even where one of the parties has failed to file such a statement—or, presumably, where the statement filed by a party fails to satisfy the dictates of Rule 56.1. *See Monahan,* 214 F.3d at 292 (internal citations and quotation marks omitted). A district court may not grant summary judgment under Fed. R.Civ.P. 56 unless it is satisfied that judgment for the moving party is "appropriate" because "the ... admissions on file ... show that ... the moving party is entitled to judgment as a matter of law." *Holtz,* 258 F.3d at 74 n. 1.

The following relevant facts are deemed undisputed, unless otherwise noted; where the facts are disputed, they are viewed more favorably to plaintiff, the non-moving party.

## A. Plaintiffs Employment History

### 1. Pre–Agreement Employment

In 1968, plaintiff began his employment with Alitalia as an accountant. During the course of his employment at the company, Gallo rose in rank, eventually becoming General Manager for the Americas, a position he held until 2002. (Def. Rule 56.1 ¶ 3.) In 2002, Gallo became the Senior Vice President of Corporate Affairs for North America. In this position, Gallo reported directly to Alitalia's Rome headquarters. He oversaw the Vice President of Regulatory Affairs, the Vice President of Public Relations, the Human Resources Department and all legal matters affecting Alitalia in North America. (*Id.*)

In 2003, defendant Galli was transferred to Alitalia's New York office, where plaintiff worked. Upon Galli's transfer to New York, Gallo reported directly to Galli. (*Id.* at ¶ 4.) Around July 2004, Galli was promoted to Senior Vice President of Worldwide Sales and was transferred back to Rome. Despite the transfer to Rome, Gallo still reported directly to Galli. (*Id.*)

During this time period, Alitalia was experiencing major financial problems. As a result, Alitalia implemented worldwide cutbacks. (*See id.* ¶ 5.) In 2004, Alitalia's New York office had 130 employees. (*Id.* ¶ 6.) During 2005, the New York office decreased to seventy-five employees. In 2006, the New York office had fifty-eight employees, and by the end of 2007, Alitalia's New York office only had forty-eight employees. (*Id.*)

Although Alitalia greatly decreased its number of employees from 2004 to 2007, it did occasionally hire a new employee. In 2004, the New York office hired three employees, and three additional employees

were hired in 2005. Nine employees were hired in 2006—two of whom were over the age of forty-five. In 2007, seven employees were hired, one of whom was fifty-four years old. (*Id.* ¶ 7.)

While plaintiff claims that Alitalia's discrimination against him occurred beginning September 15, 2005, he alleges that as early as 2002, Alitalia embarked on a systematic scheme to replace its older employees with younger workers. (*Id.* ¶ 29.) Plaintiff testified that defendant Libutti directed him to fire Alitalia employees based on the employees' age, as well as their sexual orientation and disabilities. (*Id.* ¶ 30.) Gallo maintains that he vigorously opposed such practices and refused to fire any employee because of his or her age or sexual orientation.[8] (*See* Pl. Rule 56.1 ¶¶ 30–31.)

In 2004, Alitalia arranged for a voluntary early retirement program ("ERP"), which offered enhanced severance to New York Sales Division employees who were fifty-five or older and had at least fifteen years of service with Alitalia. (Def. Rule 56.1 ¶ 32.) Alitalia extended the ERP to other departments in the New York office, and by September 2005, offered an ERP for employees who were fifty years or older and had at least fifteen years of service. (*Id.*) Plaintiff acknowledges that "quite a few" employees who elected not to participate in the ERP were kept as employees by Alitalia. (*Id.* ¶ 33.)

## 2. Post–Agreement Employment

On September 15, 2005, Alitalia and Gallo entered into an agreement that ended plaintiff's "last day of regular employment with Alitalia," and immediately made him a "Consultant." The Agreement provided that plaintiff receive, *inter alia:* (1) a separation payment of $300,000; (2) a $54,000 contribution to his pension plan; and (3) three separate payments of $200,000 to be paid every six months. (Def. Rule 56.1 ¶ 9.) Additionally, the Agreement provided that plaintiff continue to receive "all employee benefits to which [he] … is currently entitled and in which he is currently participating, or payment necessary to privately purchase their equivalents, up to age sixty-five (65)." (Sept. 15, 2005 Agreement ¶ 2.)

Plaintiff does not dispute that he received the separation payment, contribution to his pension plan and the three separate payments of $200,000.

Plaintiff argues however, that despite the wording of the Agreement, he still was an employee of Alitalia after he signed the Agreement. (Pl. Rule 56.1 ¶ 8.) Clearly, the Agreement provides that plaintiff's consultancy constituted "employment." (*See* Sept. 15, 2005 Agreement ¶ 2.)

After plaintiff became a consult for Alitalia, he was instructed by Galli to report to defendant Libutti. (Def. Rule 56.1 ¶ 13.) The conduct that forms the basis of plaintiff's complaint is based on the events that occurred thereafter. (*See id.* ¶ 8; Pl. Rule 56.1 ¶ 8.)

## B. Defendants' Alleged Post–Agreement Conduct

Once he became a consultant, plaintiff claims that he was subjected to a number of negative and disparaging comments in the workplace. (*See* Def. Rule 56.1 ¶¶ 34–35, 37–40.) Libutti frequently made comments about plaintiff's age, American citizenship, perceived homosexuality and disabilities. (*Id.* ¶¶ 34–35, 37.) Plaintiff testified that Libutti called him an "old man" and said that Gallo was no "young chicken." (*Id.* ¶ 34.) Plaintiff alleges that, on an almost daily basis, Libutti called him an "American Shit" or told Gallo that he should quit because he

---

8. Plaintiff does not claim he refused to fire an employee based on her disability.

was no longer an Italian citizen. (Pl. Mem. Opp'n Ex. D ¶ 21 (hereinafter Gallo Aff.).) Libutti continually told Gallo that he was crazy, sick and could not do the job, or compared him to a former employee who had been sent to a mental institution, telling plaintiff that he should have been treated along side the former employee. (Gallo Aff. ¶ 20; Def. Rule 56.1 ¶ 37.) Further, Libutti frequently made derogatory comments about plaintiff's perceived sexual orientation, such as, "you must be very busy taking it in the ass." (Gallo Aff. ¶ 23.)

Libutti was not the only person at Alitalia to make these types of comments to Gallo. Plaintiff testified that defendant Galli made critical comments about how Alitalia's office is a "bunch of frocci [sic], bunch of lesbian." (Def. Rule 56.1 ¶ 38.) In talking to plaintiff, Galli apparently referenced Gallo's age, and made Gallo feel he "was old enough to leave and that [sic] was a good thing for ... [Gallo] to leave Alitalia." (Id. ¶ 39.) Not only did Galli occasionally make these types of comments to plaintiff, but when plaintiff complained to Galli about harassment from other Alitalia employees, Galli allegedly replied, "[T]he retaliation and harassing behavior of Mr, Libutti was in ... [Gallo's] head because ... [Gallo] was a psychiatric mental-ill person." (Koral Aff. Ex. 39 at 296:24–297:3.)

In addition to the frequent insults heaved upon Gallo, plaintiff claims that, on at least two occasions, Libutti assaulted him.[9] (Pl. Rule 56.1 ¶ 43.) The second confrontation occurred after plaintiff told Libutti he "greatly opposed" Libutti's discriminatory practices. (Gallo Aff. ¶ 34.) In response, Libutti had plaintiff follow him into his office, where he "slammed" Gallo against the door, grabbed Gallo's arms and pushed him toward the other wall in the office, near the window. (Id.

¶ 36.) Although plaintiff was terrified, he tried to free himself from Libutti's grasp, and told Libutti that he wanted to leave the office. Libutti replied by telling plaintiff, "You will be free to go, only after you have listened to me ...." (Id.) Shortly after this incident, plaintiff did not go to the office for three days, because he "endur[ed] much suffering." (Id. ¶ 45.)

Plaintiff testified that he reported such incidents both to Galli and to the General Counsel of Alitalia, Leopoldo Conforti ("Conforti"). (See Koral Aff. Ex. 39 at 303:23–305:10.) Conforti denies knowing that either Galli or Libutti made discriminatory remarks. (Def. Rule 56.1 ¶ 49.)

In early 2006, while the alleged harassing conduct was taking place in Alitalia's New York office, Alitalia's internal audit department in Rome performed an audit of Alitalia's North American operations. (Def. Rule 56.1 ¶ 14.) The audit revealed several serious problems at Alitalia's New York office. (Id.) Alitalia's then-CEO, Giancarlo Cimoli—noting the "deplorable and risky degradation" of Alitalia's North American operations—demanded a meeting with Alitalia's CFO, Gabriele Spazzadeschi ("Spazzadeschi"), and Alitalia's Executive Vice President for Human Resources, Massimo Cestaro ("Cestaro"). (Id. ¶ 15.) The Defendants contend that, as a result of this meeting, Spazzadeschi and Cestaro made the decision not to renew the Agreement with plaintiff. (Def. Rule 56.1 ¶ 16.) Gallo has never met or spoke to Spazzadeschi and Cestaro (Id. ¶ 17)

Plaintiff disputes Defendants' contention, and instead asserts that Galli and Libutti were involved in the decision to fire him. Plaintiff maintains that Defendants fired him because he was perceived to be a homosexual, an older worker, refused to

---

9. The first physical confrontation is described at the beginning of this opinion.

terminate older workers at Alitalia and defended gays, lesbians and older workers. (Pl. Rule 56.1 ¶¶ 16, 18.)

On May 8, 2006, Galli and Libutti told plaintiff that Alitalia was not going to renew the Agreement when it expired in March 2007. (*Id.* ¶ 19.) This decision was formalized in letter that Alitalia sent to plaintiff on May 23, 2006. (*Id.* ¶ 20.) By the end of the month, plaintiff became disabled (see below) and ceased working at Alitalia. (*See* Gallo Aff. ¶ 48.) Alitalia did not replace plaintiff, his duties were distributed to other employees. (Def. Rule 56.1 ¶ 20.)

## C. Post–Employment Conduct

After plaintiff stopped working at Alitalia, a number of events occurred that form the basis for additional claims against the Defendants.

On or about the beginning of June 2006, an attorney for another Alitalia employee, Dursun Oksuz ("Oksuz"), contacted Alitalia's counsel to report an allegation by Oksuz that a "senior corporate official" had sexually harassed him. (Def. Rule 56.1 ¶¶ 51–53.) Oksuz accused plaintiff of having seduced him, sexually harassed him and engaged in frequent oral and anal sexual intercourse. (*See id.* ¶¶ 53, 57.) Moreover, Oksuz claimed that plaintiff abused his position of authority at Alitalia by giving Oksuz a "big promotion"—Cashier to Vice President of Regulatory Affairs—so that Oksuz would not leave Alitalia and his sexual relationship with plaintiff could continue. (*Id.* ¶¶ 53, 57–58.) On June 16, 2006, Oksuz formally filed a charge with the New York State Division of Human Rights. (*Id.* ¶ 57.)

At the urging of Libutti, plaintiff met with Alitalia's counsel. (*Id.* ¶ 55.) During this meeting, plaintiff received a copy of a June 14, 2006 letter that Oksuz's counsel had sent to Alitalia. (*Id.* ¶¶ 54–55.) The letter purportedly contained copies of instant messages and e-mails between Oksuz and plaintiff that revealed explicit romantic and sexual communications. (*Id.*)

On June 21, 2006, plaintiff felt suicidal and immediately checked himself into the Payne Whitney Clinic ("the Clinic"). (*Id.* ¶ 60.) Plaintiff stayed at the Clinic for approximately ten days. Plaintiff has subsequently testified that, during his treatment at the Clinic, he told a counselor that his marriage was "purely an arrangement," and that he had sought separation from his wife. (*Id.* ¶ 61.)

Upon returning home from the Clinic, plaintiff told his wife, Nunzia Fatica Gallo ("Fatica Gallo"), about Oksuz's allegations. (*Id.* ¶ 56.) He was surprised to learn that his wife already knew about them. (*Id.* ¶ 56.) Fatica Gallo testified that Libutti had called her in order to convince her to persuade Gallo not to sue Libutti or Alitalia. (Def. Opp. Mem. Ex. H ¶¶ 3–6 (hereinafter Fatica Gallo Aff.).) In return, Libutti promised to help her by not asking Gallo to repay Alitalia for any amount Alitalia had to pay to Oksuz. (*See id.*; Koral Aff. Supplemental. Reply Ex. B at 50:19–51:8.) During this conversation, Fatica Gallo testified that Libutti told her that Gallo was a homosexual, and that Gallo had engaged in a sexual affair with Oksuz. (Fatica Gallo Aff. ¶ 3.)

In or about May 2006, plaintiff was diagnosed with Corticobasal Degeneration, a progressive disease of the neurological system. (Def. Rule 56.1 ¶¶ 21–22.) By May 30, 2006, plaintiff's doctor, John Caronna, determined that plaintiff had a "permanent disability" and declared him "totally restricted." (*Id.* ¶ 21.) A second doctor, Stefan Stein, confirmed this diagnosis. (*Id.*) That was the point at which plaintiff ceased working for Alitalia.

In or about July 18, 2006, plaintiff applied for long term disability payments from Alitalia's long term disability insur-

ance provider, UNUM Provident—First UNUM Life Insurance Company ("UNUM"). (*Id.* ¶ 21.) UNUM rejected plaintiff's claim for long term disability payments on the grounds that plaintiff was not an "employee" of Alitalia. (*Id.* ¶ 25.) Plaintiff has testified that he intends to appeal UNUM's decision and bring a lawsuit against them. (*Id.*) Currently, plaintiff receives Social Security Administration disability benefits (*Id.* ¶ 27.)

Plaintiff contends that, after he stopped working for Alitalia in May 2006—but before the termination of the Agreement, which was not due to expire until March 2007—the company stopped providing him with numerous employee benefits; his automotive expenses (e.g. garage fees, gas and tolls), health insurance and cell phone. (Pl. Rule 56.1 ¶ 10.) Additionally, Alitalia purportedly stopped contributing to plaintiff's 401(k) plan, failed to give him a gold Rolex watch, cancelled his supplemental pension plan, and did not reimburse him for expenses he had to pay for when the Italian Vice–Prime Minister visited New York City. (*Id.*) In his testimony, however, plaintiff conceded that he is covered to this day under Alitalia's life insurance, accidental death insurance and short-term disability insurance policies, as well as the company's dental plan. (Def. Rule 56.1 ¶ 10; Koral Aff. Ex. 28 at 197:3–198:23.) Alitalia contends that plaintiff is still covered by its health insurance as well. (Def. Rule 56.1 ¶ 10.)

Additionally, plaintiff received a lump sum payment of $47,000 on April 2, 2007. (Koral Aff. Ex. 9.) Alitalia claims this was to cover the costs of the other miscellaneous benefits—including car and cell phone expenses—that it was responsible to plaintiff until he reached the age of sixty-five, per the terms of the Agreement. (Def. Rule 56.1 ¶ 10; Sept. 15, 2005 Agreement ¶ 2.) Alitalia initially offered plaintiff $60,000 to cover the miscellaneous bene-

fits, which included coverage for car insurance payments for the company car Gallo used. Plaintiff kept the car, but refused to take ownership of it. As a result, Alitalia deducted $13,000 from the initial $60,000, so it could continue paying for Gallo's car insurance. (Def. Rule 56.1 ¶ 10 n. 2.)

The parties do not agree over the monetary value of the miscellaneous benefits that Gallo ceased receiving. (*Id.* ¶ 11; Pl. Rule 56.1 ¶ 11.)

### Standard of Review

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

## Discussion

### I. Employment Discrimination

■ As an initial matter, plaintiff has offered no evidence whatsoever that could cause a reasonable trier of fact to conclude that his disability, Corticobasal Degeneration, was used to create a hostile work environment, was used as a basis for discriminatory termination, or was connected to any act of alleged retaliation. In fact, there is no evidence that Alitalia knew about plaintiff's disability until May 2006, when he stopped working after being diagnosed.

Any claim by plaintiff that UNUM's decision to deny him insurance coverage constituted disability discrimination must be dismissed as well, because it is pre-empted by ERISA. Plaintiff is in the process of appealing UNUM's decision denying him benefits; if the decision is not overturned plaintiff can bring an action in review of that administrative decision. Consequently, plaintiff's hostile work environment, discriminatory termination and retaliation claims based on his disability are dismissed, and Defendants' motion for summary judgment on each of these claims is granted.

### A. Hostile Work Environment

Plaintiff brings employment discrimination claims, alleging that the Defendants violated New York State Human Rights Law ("HRL"), N.Y. Exec. Law § 296(1)(a), and New York City Human Rights Law ("CHRL"), N.Y.C. Admin. Code § 8–107(1)(a). Plaintiff's hostile work environment claim under the HRL is analyzed under the same legal standards as similar claims brought pursuant to Title VII. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998); *Ponticelli v. Zurich Am. Ins. Group,* 16 F.Supp.2d 414, 427–28 (S.D.N.Y.1998).

■ Title VII provides that "It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex, or national origin." 42 U.S.C. § 2000e–2(a). The phrase "terms, conditions, or privileges of employment" is broad enough to render actionable making an employee work in a discriminatory, hostile or abusive environment.[10] *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). In order to prevail on a hostile work environment claim, a plaintiff must establish both that the work environment was hostile and that there is a specific basis for imputing the conduct that created the environment to the employer. *See Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998); *Gallagher v. Delaney,* 139 F.3d 338, 347–48 (2d Cir.1998).

■ With respect to the first element, the plaintiff must show that his workplace

---

10. The language of the HRL and CHRL is similar to Title VII and uses the same broad language, "terms, conditions or privileges of employment." *See* N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code § 8–107(1)(a).

was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The test has both an objective and subjective component: "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir.2004) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.1999)). Moreover, the conduct of which plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir.2004), "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support" a hostile work environment claim. *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004).

■ In determining whether the alleged harassment is of "such quality or quantity" as to meet the "severe and pervasive" standard, courts consider the totality of the circumstances, including such factors as the frequency of the conduct, its severity, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *see also Williams v. County of Westchester*, 171 F.3d 98, 100 (2d Cir.1999) (per curiam).

■ The plaintiff is also required to show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley v.*

*Town of Stratford*, 217 F.3d 141, 153–54 (2d Cir.2000). Where, as here, the actionable hostile environment is created by a supervisor with immediate (or successively higher) authority over the employee, the employer is vicariously liable for the wrongful conduct. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). However, when no tangible employment action is taken against the employee, the employer may establish an affirmative defense to liability or damages by showing that (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275; *Burlington Indus., Inc.*, 524 U.S. at 765, 118 S.Ct. 2257.

While conceding that these principles govern hostile work environment claims under the HRL, plaintiff argues that the standard just described does not apply to such claims brought under the CHRL. It is true that, in certain respects, the standard for a discrimination claim under the CHRL "is meant to be more protective than" the federal—state standard. *Ortiz–Moss v. New York City Dept. of Transp.*, No. 05 Civ. 4206, 2008 WL 1899950 at *17 (S.D.N.Y. Apr. 18, 2008). In 2005, the City Council passed the Restoration Act, requiring the CHRL "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed." N.Y.C. Admin. Code § 8–130. Thus, some courts have determined

that "the case law that has developed in interpreting both the [HRL] and Title VII should merely serve as a base for the [CHRL], not its ceiling." *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F.Supp.2d 275, 283 (S.D.N.Y.2006) (quoting *Farrugia v. North Shore Univ. Hosp.*, 13 Misc.3d 740, 820 N.Y.S.2d 718, 724 (N.Y.Sup.Ct. 2006)).

Plaintiff argues, that under the CHRL a hostile environment claim should solely compare the treatment of plaintiff with that of other employees, and that questions of severity and pervasiveness should be considered only in assessing damages. (*See* Pl. Mem. Opp. at 7.) There is some support for plaintiff's argument in decisions of New York state trial courts. However, this Court is unaware of any appellate decision in the New York court or in the Second Circuit that recognize such a rule. *See also Ortiz–Moss*, 2008 WL 1899950 at * 17 (noting the same). Furthermore, the cases that plaintiff does rely on for supporting this proposition have misinterpreted the CHRL.

In *Farrugia*, a New York Supreme Court decision, the court denied a motion for summary judgment on hostile environment claims because the plaintiff alleged sufficient facts supporting a claim of sexual harassment. 820 N.Y.S.2d at 725–26. In reaching its decision, the court held, "Under the City's law, liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages." *Id.* at 725 (citing Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb. L.J. 255, 297–303 (2006)). Significantly, the cited passage in Gurian's article does not stand for the proposition that the Restoration Act removed the severe and pervasive requirement. Rather, this passage discusses the author's belief that liability and

damages *should be* disaggregated, and that questions of severity and pervasiveness *should* be reserved for damages. Gurian, *supra*, at 301–03. In fact, the passage recounts how various groups—prior to the passage of the Restoration Act—advocated that the "severe and pervasive" requirement be removed from the CHRL, but admits that the issue was not specifically addressed when the CHRL was amended. *See id.* at 297–303. Gurian suggests that the City Council's failure to address this issue in the amendments should be overcome by "judicial activism." *Id.* at 290–91.

I disagree. If New York City wanted to remove the "severe and pervasive" requirement, it could have done so when it amended the CHRL. It did not. Instead, the City Council ignored the suggestion that the "severe and pervasive" requirement be eliminated, and amended only those specific portions of the CHRL that the City thought needed to be addressed. *Id.* at 256–57 (noting, for example, that the amendments expanded retaliation protection). This Court declines to change the standard of law when the legislature elected not to do so.

Additionally, the reasoning of the court in *Farrugia* is flawed. It is not the existence of "unequal" treatment that is essential to determine whether a work environment is hostile, but rather the existence of *harassing* treatment. In assessing whether sufficient harassment has occurred to make an employee's work environment "abusive," one necessarily must look at whether harassing conduct was frequent and/or severe. A single instance of "unequal" treatment (between, say, a man and woman or a homosexual and heterosexual) can constitute "discrimination," but may not qualify as "harassment" of the sort needed to create a hostile work environment. If inequality of treatment were all

that the hostile work environment law required, hostile work environment and discrimination claims would merge.

In sum, this Court will assess plaintiff's hostile work environment claim under the CHRL applying the "severe and pervasive" standard that governs claims under section 296 of the HRL.

### 1. Libutti's Conduct

██ Considered in the light most favorable to plaintiff, he has put forth sufficient evidence that would allow a reasonable trier of fact to conclude that the alleged age and sexual orientation harassment by Libutti was both severe and pervasive.

The alleged harassing conduct by Libutti was severe and threatening. The plaintiff alleges that, on at least two occasions Libutti physically assaulted him as part of the harassing conduct. Additionally, plaintiff testified that Libutti made derogatory comments about his sexual orientation many times during the relevant time period, and he remarked about the plaintiff's age "several times."

The Defendants argue that these alleged incidents are "isolated" and do not rise to a level that is sufficiently severe or pervasive. (Def. Alitalia Mem. at 13.) As the U.S. Supreme Court said in *Faragher*, "simple teasing, offhand comments, and isolated incidents (unless *extremely* serious) will not amount to discriminatory changes in the terms and conditions of employment." 524 U.S. at 788, 118 S.Ct. 2275 (emphasis in original). In this case, plaintiff has offered enough evidence *of serious* incidents to see to a jury.

The Defendants correctly state that teasing and offhand comments, even if deplorable, might not be severe or pervasive enough for a claim of discriminatory harassment. However, allegations of assault are extremely serious—a single instance could be enough that "a reasonable

employee would find the conditions of her employment *altered for the worse.*" *Feingold*, 366 F.3d at 150 (emphasis in original); *DeWitt v. Lieberman*, 48 F.Supp.2d 280, 290 (S.D.N.Y.1999).

In *DeWitt*, the court denied the defendant's motion for summary judgment on a hostile work environment claim because there were allegations of physical contact. 48 F.Supp.2d at 290 (S.D.N.Y.1999). In that case, the plaintiff alleged the defendant had tried to grab her blouse and touch her left breast. *Id.* at 284. Additionally, the defendant occasionally made deplorable sexual comments to the plaintiff. Although the incidents in question were isolated, the court found that the allegations met the objective element of the hostile environment test because of the "more serious" allegation of touching in connection with the harassing comments. *Id.* at 290.

The fact that Libutti disputes these allegations is irrelevant to a motion for summary judgment. Plaintiff has satisfied the objective element with respect to Libutti's conduct.

Plaintiff offers evidence that satisfies the subjective element. The Defendants argue that Gallo could not have possibly perceived Alitalia to be a hostile work environment because Gallo: 1) made similar crude and derogatory comments to others at Alitalia; and 2) alleges that his job performance was "superior" throughout his consultancy. The first argument does no more than create a fact issue for jury resolution, while the second is so silly as not to warrant a serious comment on it.

### 2. Galli's Conduct

██ Plaintiff has failed to provide enough evidence to show that the alleged personal conduct of Galli—standing alone—created a hostile work environment. Galli's comments, even if offensive

and reprehensible, fail to satisfy the requirements of the severe and pervasive test because they were too infrequent. *See Ochei,* 450 F.Supp.2d at 285.

In *Ochei,* the court granted summary judgment because the plaintiff failed to establish a hostile work environment. The plaintiff, in that case, alleged that her fellow employee made discriminatory insults about Nigerians. *Id.* The court held, "The infrequency of these statements alone are insufficient to support Ochei's hostile work environment claim because isolated remarks or occasional episodes of harassment will not merit relief under Title VII." *Id.* at 285–86; *see also Smalls v. Allstate Ins. Co.,* 396 F.Supp.2d 364, 372–73 (S.D.N.Y.2005) (noting the same); *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 786 N.Y.S.2d 382, 819 N.E.2d 998, 1011 (N.Y.2004) (same).

During the relevant time period, plaintiff only saw Galli three or four times. He claims Galli made only a handful of comments about plaintiff's age, disability or sexual orientation. Therefore, Galli's personal conduct is too infrequent to form the basis of a hostile work environment claim.

 However, he was a supervisor at the company, Galli's acts can be attributed to Alitalia for purposes of assessing whether the company created a hostile work environment. In *Feingold,* the court vacated and remanded the district court's decision to grant summary judgment to the company on plaintiff's hostile work environment claim. The court found that because the plaintiff's immediate supervisor and the supervisor for the entire company were aware that the plaintiff was experiencing a hostile work environment, yet did nothing to remedy the situation, the discriminatory conduct could be imputed to the company. *Feingold,* 366 F.3d at

152. In this case, plaintiff offered evidence that Galli failed to respond to plaintiff's complaints about Libutti's conduct. Accordingly, plaintiff has alleged sufficient facts to go to a jury on this issue.

### 3. Alitalia's Liability

 Alitalia's motion for summary judgment about plaintiff's hostile environment claimed based on age and sexual orientation is denied. If Libutti, plaintiff's supervisor, created a hostile work environment, Alitalia will be vicariously liable for his actions. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate ... authority over the employee." *DeWitt,* 48 F.Supp.2d at 290; *see also Faragher,* 524 U.S. at 807, 118 S.Ct. 2275; *Burlington Indus., Inc.,* 524 U.S. at 765, 118 S.Ct. 2257; N.Y.C. Admin. Code § 8–107(13)(b) ("An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) The employee or agent exercised managerial or supervisory responsibility....").[11]

Additionally, as discussed above, Galli's failure to respond to plaintiff's complaints could allow a jury to impute the discriminatory conduct to Alitalia. *Feingold,* 366 F.3d at 152 ("When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer ... knew of the harassment and did nothing about it.") (internal citation and punctuation omitted).

### B. Discriminatory Termination

 In discrimination cases, the plaintiff bears the burden of introducing evi-

---

**11.** For the purposes of this motion, Alitalia did not assert a *Faragher–Ellerth* affirmative defense. (*See* Def. Galli and Libutti Reply Mem. at 3.)

dence that would, if credited, establish every element of his *prima facie* case. The plaintiff must show "1) that be belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Feingold*, 366 F.3d at 152. If the plaintiff meets that minimal burden, the defendant must come forward with a legitimate non-discriminatory reason for taking the action it took. At that point, the burden shifts back to the plaintiff to prove, with evidence and not conclusory supposition, that the defendant's articulated rationale is a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 806, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff, with admissible evidence, "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold*, 366 F.3d at 152.

■■■ The plaintiff has failed to establish a *prima facie* case of discriminatory termination.

The Defendants concede that plaintiff belonged to a protected class with respect to his age, disability and sexual orientation. (Def. Alitalia Mem. at 7.). They argue, however, that he cannot establish the other three elements of his *prima facie* case.

■■■ The Defendants first argue that plaintiff was not qualified for the position he held because of his permanent and total disability. "To demonstrate that he was qualified for the job, a plaintiff must show that he was qualified for the position at the time of the discharge, regardless of whether he had performed the positions satisfactorily in the past." *Dawkins v. Witco Corp.*, 103 F.Supp.2d 688, 696 (S.D.N.Y.

2000). If a plaintiff is not able to perform the essential functions of his job, with or without reasonable accommodation, then he is not qualified. *See Costabile v. County of Westchester, New York*, 485 F.Supp.2d 424, 435 (S.D.N.Y.2007).

The "termination" here complained of is Alitalia's refusal to renew his consultancy agreement. The decision not to renew the Agreement occurred before plaintiff became disabled. However, he was not "fired" in May 2006, rather he was told he would be fired in ten months. It is undisputed that Alitalia told plaintiff on May 23, 2006, that the Agreement would not be renewed in March 2007—ten months later. Indeed, Alitalia reserved the right to give plaintiff appropriate assignments as long as the Agreement remained in effect. (Koral Aff. Ex. 17.) After plaintiff was told that he only had ten months left on the job—but well before his contract expired—plaintiff became totally disabled. He left Alitalia at then end of May 2006 only because he became disabled.

Plaintiff offers no evidence refuting Defendants' argument that "Plaintiff was medically unable to work many months before his consulting contract could have been renewed[, thus] undermin[ing] any discriminatory termination claim because he was not qualified for his job." (Def. Alitalia Mem. at 8.) In particular, plaintiff offers no evidence that he could have gone back to work at any time since May 30, 2006, when his physician declared him totally disabled. Accordingly, plaintiff's termination claims fail.

Since plaintiff failed to establish one prong of the *prima facie* requirements, it is unnecessary to address all other arguments associated with the discriminatory termination claims. Alitalia's motion for summary judgment on plaintiff's discriminatory termination claim under the HRL and CHRL is granted.

## C. Retaliation

 To establish a *prima facie* case of retaliation, a plaintiff must show that: 1) he was engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered a materially adverse action; and 4) there was a causal connection between the protected activity and the adverse employment action. *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997) (applying the same standard to HRL claims); *Pugni v. Reader's Digest Ass'n, Inc.*, 05 Civ. 8026, 2007 WL 1087183 at *22 n. 6 (S.D.N.Y. Apr.9, 2007) (same). If the plaintiff meets this burden, the *McDonnell Douglas* burden-shifting analysis used in claims of discrimination—articulated above—also applies to retaliation claims. *Bush v. Fordham Univ.*, 452 F.Supp.2d 394, 415 (S.D.N.Y. 2006) (citing *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003)).

 The *prima facie* standard for retaliation claims under the CHRL is different, in that there is no the requirement that the employee suffer a materially adverse action. Instead, the CHRL makes clear that it is illegal for an employer to retaliate in "any manner." *Selmanovic*, 2007 WL 4563431 at *5; *Sorrenti v. City of New York*, No. 113037/02, 2007 WL 2772308 at *4 (N.Y.Sup.Ct. Aug.16, 2007) (unreported); *Farrugia*, 820 N.Y.S.2d at 727. The relevant provision states:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies *to retaliate or discriminate in any manner against any person because such person has* (i) *opposed any practice forbidden under this chapter*, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) com-

menced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8–115 of this chapter. *The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment,* housing or a public accommodation *or in a materially adverse change in the terms and conditions of employment,* housing, or a public accommodation, *provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.*

N.Y.C. Admin. Code § 8–107(7) (emphasis added). Thus, under the CHRL a plaintiff must show: 1) he engaged in a protected activity; 2) his employer was aware of that activity; [12] 3) he suffered an action that would be reasonably likely to deter a person from engaging in a protected activity; and 4) that there was a causal connection between the protected activity and the action. If relevant, the *McDonnell Douglas* burden-shifting analysis also applies.

### 1. Protected Activity

The Defendants argue that Gallo did not participate in a protected activity. First, they argue that plaintiff conceded he did not ever complain to anyone at Alitalia about Galli's conduct. (Def. Rule 56.1 ¶ 45.) Second, they argue that Gallo only made generalized-ambiguous complaints about Libutti twice, and that as a matter of law, such complaints are not considered

---

**12.** The parties do not dispute this prong.

protected activity. *See Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC,* 470 F.Supp.2d 345, 357 (S.D.N.Y. 2007) ("ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity."). Finally, the Defendants argue that plaintiff's complaints about discrimination against other employees are not protected because Gallo could not have reasonably believed that the other employees were in fact being discriminated against.

■ The Defendants arguments are misplaced. There are disputed issues of fact, as plaintiff has testified that he (1) protected the jobs of employees whom Defendants wanted to fire for discriminatory reasons and (2) complained about Libutti's conduct.

■ Plaintiff testified that, after Libutti made a series of derogatory and discriminatory remarks about sexual orientation, plaintiff approached Libutti—his supervisor—and told him directly that such discriminatory conduct needed to stop immediately. Further, when Libutti then berated Gallo for such protests and made more discriminatory remarks, Gallo again told Libutti he opposed such practices. What the plaintiff testified he told Libutti is not generalized or ambiguous—it is direct. A direct complaint about prohibited conduct to a supervisor is a protected activity. *Id.*[13]

■ The Defendants argue that plaintiff's complaints about other discriminatory practices and schemes against other employees at Alitalia cannot be considered a protected activity because plaintiff could not have reasonably believed that these other employees were being discriminated against. In order for an activity to be considered protected, an employee needs to have a good-faith, reasonable belief that he is opposing an unlawful employment practice. *Kessler v. Westchester County Dept. of Soc. Servs.,* 461 F.3d 199, 210 (2d Cir.2006).

In this case, whether plaintiff had a good-faith, reasonable belief that he opposed a discriminatory scheme based on an employee's age is disputed. Defendants argue that, because a number of employees who should have been fired if there were a discriminatory scheme were not in fact fired, there was no scheme. Plaintiff, however, testified that he was instructed to fire such employees, but instead protected their jobs. A reasonable jury could credit plaintiff's testimony, and thus find he had a reasonable belief that a discriminatory scheme existed based on an employee's age.

## 2. The Action Plaintiff Suffered

■ Plaintiff has satisfied the HRL standard that he suffered a materially adverse action and the CHRL standard that he suffered an action that would be reasonably likely to deter a person from engaging in a protected activity.[14]

In order to satisfy the "materially adverse" test, a plaintiff must "show that the challenged action well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co.,* 548 U.S. at 54, 126 S.Ct. 2405. This means, for example, that, "A materially adverse change might be indicated by a termination of employment, a demotion ev-

---

13. Even if plaintiff's alleged complaints to the general counsel of Alitalia were ambiguous, as Defendants contend, the fact that Gallo complained to Libutti is enough to satisfy the protected activity requirement.

14. Any claim that satisfies the more demanding federal or state standard for retaliation also satisfies the standard under the CHRL.

idenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Leibowitz v. Cornell Univ.*, No. 03 CV 9976, 2007 WL 3019223 at *5 (S.D.N.Y. Oct. 12, 2007).

Plaintiff argues, *inter alia*, that the Defendants retaliated against him by not deciding to renew the Agreement. Thus, the relevant issue about the Agreement is whether the decision not to renew the Agreement is considered a materially adverse change.

In *Leibowitz*, the court granted defendants' summary judgment motion, dismissing the plaintiff's discrimination claims because the plaintiff was unable to demonstrate she had suffered an adverse employment action. *Id.* at *7. In that case, the plaintiff argued that she suffered an adverse employment action when the defendants took away her life tenure position. The plaintiff argued that although she was officially a five-year contract employee, she had an implicit guarantee of tenure. *Id.* at *5. The court disagreed and found that she did not have a guarantee of tenure, and thus suffered no adverse change. *Id.* at *7. Notably, in examining the possible factors that could provide sufficient evidence of a materially adverse change, the court determined, "Plaintiff was not terminated; her unrenewed contract would have simply expired by its terms." *Id.* Thus, the non-renewal of a contract that does not contain a guarantee of renewal, by itself, is not materially adverse.

*Leibowitz*, however, is not on point because the Agreement in this case *does* contain a guarantee of renewal. The Agreement states, in pertinent part, "This consultancy will automatically renew for successive eighteen (18) month terms if it is not cancelled by Alitalia within six (6) months before the end of the term in effect at the time. If the consultancy is cancelled by Alitalia in due time, the parties will have the opportunity to negotiate towards a new agreement." (Sept. 15, 2005 Agreement ¶ 3.) Although the Agreement does allow Alitalia to cancel the consultancy, it requires Alitalia to negotiate a new arrangement. Here, Alitalia's decision to cancel the consultancy without offering plaintiff the chance to re-negotiate satisfies the materially adverse prong.

Additionally, plaintiff argues that he suffered an adverse action when Libutti physically assaulted him. I agree. Once an employee engages in a protected activity, some forms of harassment—including physical assault—are materially adverse because a jury could find that the assault "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry., Co.*, 548 U.S. at 54, 126 S.Ct. 2405; *see also Gregory*, 243 F.3d at 701 (2d Cir.2001).

In *Gregory*, the court vacated the judgment of the district court insofar as it dismissed the plaintiff's claims of employment discrimination and retaliation. 243 F.3d at 689. The plaintiff alleged that, after she had filed complaints about the executive director's conduct, the executive director, among other things, increased his harassing behavior against her. The court found that allegations of harassing behavior against an employee after she engaged in a protected activity could satisfy the adverse action requirement. *Id.* at 701 ("we apply the same standards in determining whether *retaliatory* harassment constitutes an adverse employment action as we do in assessing whether harassment *imposed because of sex* works an actionable alteration in the terms or conditions of employment.") (emphasis in original). Significantly, the court found that the fact

that the harassing behavior the plaintiff initially complained of increased after she made her complaint meant that she satisfied her burden that an adverse action had been taken against her. *Id.*

In this case, plaintiff testified that, after he complained to his supervisor about the supervisor's discriminatory conduct based on sexual orientation, the supervisor assaulted him. If true, such conduct certainly meets the adverse action prong because it constitutes a direct increase in harassment against an employee.

The Defendants make two arguments in asserting that the plaintiff has failed to satisfy the adverse action prong of his *prima facie* case. First, they argue Alitalia took no action that disadvantaged Gallo because it still paid him out under the Agreement, with full benefits, after the company decided not to renew. Second, Defendants argue that offensive utterances by co-workers are not an action that would be reasonably likely to deter an employee from engaging in a protected activity under the CHRL. These arguments do nothing more than raise genuine issues of fact. Plaintiff's evidence satisfies the adverse action requirement under the HRL and CHRL.

### 3. Causal Connection

The Defendants argue that plaintiff has failed to satisfy the final prong of his *prima facie* burden for a retaliation claim. Specifically, the Defendants argue that there is no causal connection between the decision to not renew the Agreement and the alleged protected activity because the individuals responsible for making the decision to terminate plaintiff were not aware that he had engage in any protected activity. (Def. Mem. at 17.) Again, the Defendants' argument is misguided.

▮▮▮ Plaintiff may demonstrate proof of a causal connection, "by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987) (internal citations omitted). Additionally, the causal connection "needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Feingold,* 366 F.3d at 156 (internal citation and quotation omitted). Plaintiff has provided ample evidence to satisfy this standard.

First, the adverse actions that plaintiff complains of were proximate in time to the protected activity. *Gregory,* 243 F.3d at 701. Plaintiff testified that Libutti assaulted him immediately after plaintiff complained to Libutti. Additionally, shortly after Libutti assaulted him, plaintiff's consultancy services were cancelled. The timing of these actions alone satisfies the causal connection requirement.

Second, the intensified harassment—in the form of physical assault—that plaintiff experienced after he complained of discrimination evidences a retaliatory animus. This type of evidence, if credited, demonstrates proof of a causal connection. *See Gregory,* 243 F.3d at 701: *DeCintio,* 821 F.2d at 115.

The Defendants' evidence about who made the decision to cancel plaintiff's consultancy services, if true, might convince a jury that there was no causal connection between Alitalia's decision to cancel his services and the complaints. However, "the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its

duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). Therefore, plaintiff's proffered evidence raises a genuine issue of material fact about whether Alitalia's decision to cancel his consultancy services was causally connected to the protected activity he engaged in.

### 4. McDonnell Douglas

The Defendants argue that Alitalia has set forth a legitimate nondiscriminatory reason for canceling plaintiff's consulting services, and that his retaliation claims must be dismissed because the plaintiff has produced no evidence that this reason is pretextual. The Defendants contend that plaintiff's consulting services were cancelled as part of restructuring that was ordered after an internal audit revealed severe management problems.

Once an employer offers a legitimate non-discriminatory reason for discharging an employee, the employee then has the burden to show that the employer's stated reason "was merely a pretext for discrimination." *Gallo,* 22 F.3d at 1224. To satisfy his burden in the context of summary judgment, the "plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Id.* at 1225 (emphasis in original).

As an initial matter, it should be noted that Defendants' argument does not address plaintiff's claim that Libutti retaliated against him by physically assaulting him and that Alitalia is liable for that attack. It is virtually impossible for a defendant to offer a legitimate non-discriminatory reason for assaulting an employee-except, perhaps, in the case of self-defense. For that reason alone, plaintiff's retaliation claim cannot be dismissed.

Furthermore, plaintiff has offered sufficient evidence of pretext to see this case to a jury. The Defendants concede, for purposes of summary judgment, that Gallo has presented evidence sufficient to show "Alitalia was rife with discriminatory schemes and hateful comments by Libutti." (Def. Alitalia Reply Mem. at 7.) Further, plaintiff was a thirty-eight-year veteran of Alitalia with an excellent employment record. Plaintiff's supervisors were not fired as part of the internal audit, despite the fact that the audit revealed severe management problems. A jury could conclude, in the view of this evidence, that Alitalia's non-discriminatory reason was pretextual.

Accordingly, Alitalia's motion for summary judgment on plaintiff's retaliation claim under the HRL and CHRL based on age and sexual orientation is denied.

### D. Galli and Libutti's individual liability for employment discrimination claims

Plaintiff brought his hostile work environment claim, discriminatory termination claim, and retaliation claim against the individual defendants, as well as Alitalia. The individual defendants, as a matter of law, cannot be held liable in their personal capacities. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995) *abrogated on other grounds by Burlington Indus., Inc.,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633. Thus, the individual defendants' motion for summary judgment on plaintiff's hostile work environment, discriminatory termination, and retaliation claims is granted.

However, the HRL and CHRL both provide that an individual employee may be personally liable for a hostile work environment, discriminatory termination, and

retaliation claims. N.Y. Exec. Law § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."); N.Y.C. Admin. Code § 8–107(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."). Galli and Libutti could be held liable under the HRL and CHRL as aiders and abettors. N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8–107(6); *Tomka*, 66 F.3d at 1317; *DeWitt*, 48 F.Supp.2d at 293.

■ Before accessorial liability can be found as to an alleged aider and abettor, the plaintiff must first establish liability as to the employer/principal. *DeWitt*, 48 F.Supp.2d at 293 (citing *Murphy v. ERA United Realty*, 251 A.D.2d 469, 674 N.Y.S.2d 415, 417 (2d Dep't 1998)). This also means, as the plain language of the HRL and CHRL suggest, that an employer cannot aid and abet its own alleged violations of the discrimination laws. For that reason, Alitalia's claim for summary judgment on plaintiff's claims for aiding and abetting is granted.

As for the individual defendants, plaintiff offered more than enough evidence to get to the jury. Plaintiff presented sufficient evidence to establish a genuine issue of material fact as to whether Alitalia created a hostile work environment and retaliated against him based on age and sexual orientation.[15]

■ For individual defendant Libutti, plaintiff has offered enough evidence to permit a triable question as to whether: 1) he aided and abetted the creation of the hostile work environment by participating in its creation; or 2) he aided and abetted the retaliation against the plaintiff by physically assaulting him.

■ For individual defendant Galli, genuine issues of material fact exist as to whether Galli aided and abetted the hostile work environment and retaliation claim. Plaintiff has testified that he told Galli-a high-level manager at Alitalia-about Libutti's conduct, and Galli did nothing to remedy the situation. There is thus a triable question as to whether Galli's failure to address Libutti's actions aided and abetted the hostile work environment. *See Feingold*, 366 F.3d at 158.

The individual defendants also argue that they did not have anything to do with the decision to cancel plaintiff's consultancy services, and thus cannot have aided and abetted retaliation associated with the cancellation. However, plaintiff has offered evidence that would allow a jury to discredit their testimony. Plaintiff testified that Galli and Libutti were the employees that told him that his services were being cancelled. Plaintiff also testified that Libutti evidenced a direct animus toward him, and that he told Galli about the same. Further, plaintiff testified that he had a stellar employment record. This testimony, coupled with the fact that an alleged discriminatory scheme existed at Alitalia, could provide a jury with reason to believe that Galli and Libutti were somehow involved in the decision to cancel plaintiff's consultancy services. Hence, a genuine dispute of material facts exists about this issue.

Accordingly, Libutti's motion for summary judgment on the aiding and abetting claim is granted as to claims of discriminatory termination and is otherwise denied.

---

**15.** As noted above, plaintiff failed to present enough evidence to support a discriminatory termination claim.

Galli's motion for summary judgment is granted as to the discriminatory termination claims and as to the retaliation claims insofar as they are grounded in Libutti's physical assault of the plaintiff, and is otherwise denied.

### E. Citizenship Discrimination

■ Plaintiff alleges that the Defendants' unlawful discrimination included discrimination because Gallo is an American citizen. Under the HRL, "There is no legally cognizable discrimination cause of action based on citizenship." *Sheikh v. Habib Bank Ltd.*, 270 A.D.2d 107, 108, 704 N.Y.S.2d 75 (1st Dep't 2000); N.Y. Exec. Law § 296(1)(a).

■ Contrary to the Defendants' contention, however, the CHRL does prohibit discrimination against American citizens. The CHRL makes in unlawful:

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or *alienage or citizenship status of any person,* to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8–107(1)(a) (emphasis added). The CHRL defines the term alienage or citizenship status to mean, "(a) *The citizenship of any person,* or (b) The immigration status of any person who is not a citizen or national of the United States." *Id.* § 8–102(21) (emphasis added).

The plain text of the statute indicates that an American citizen is protected by section 8–102(21)(a). First, the term "any person" is an all encompassing term that does not differentiate among groups, meaning American citizens are included—

not excluded. *See* Merriam–Webster's Third New Int'l Dictionary Unabridged 97 (3d ed.1993) (defining "any" as "one indifferently out of more than two: one or some indiscriminately of whatever kind."). If New York City intended to exclude American citizens from subsection (a) it could have done so, for example, by stating "any person, except an American/United States citizen."

■ Second, the legislature's construction of subsection (b) confirms that citizenship discrimination is prohibited. Subsection (b) expressly provides protection to people who are not citizens or nationals of the United States—that is, people who are commonly referred to as aliens. *See* Black's Law Dictionary 79 (8th ed. 2004) ("A person who resides within the borders of a country but is not a citizen or subject of that country.... In the United States, an alien is a person who was born outside the jurisdiction of the United States, who is subject to some foreign government, and who has not been naturalized under U.S. law."). Defendants' contention that the term alienage or citizenship status only prohibits discrimination against aliens would make subsection (a) superfluous. Further, the construction of subsection (b) demonstrates that the City Council knew how to exclude American citizens from the statute by explicitly doing so in subsection (b). The legislature did not make such exclusion in subsection (a). I thus find that subsection (a) includes protection for American citizens.

■ Having so found, I am constrained to note that plaintiff has utterly failed to allege sufficient facts to make out a claim of unlawful discrimination based on citizenship. As discussed above, the evidence the plaintiff has submitted that has supported his still remaining claims of discrimination are based on his age and perceived sexual orientation. There is no evidence that

plaintiff has provided that demonstrates the hostile work environment or retaliation was based on his citizenship status, despite the utterance of comments about his having become a naturalized U.S. citizen. These comments are directed toward Defendants' alleged sexual orientation discrimination, since they indicate that plaintiff became an American citizen so he could be "protected" by American lawyers from anti-homosexual conduct.

Accordingly, Defendants' summary judgment motion to dismiss plaintiff's citizenship discrimination claims under the HRL and CHRL is granted.

### F. Coercion

Subsection 19 of the unlawful discriminatory practices law states:

> It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, *any right granted or protected pursuant to this section.*

N.Y.C. Admin. Code § 8–107(19) (emphasis added). Assuming, *arguendo,* that subsection 19 allows for an independent cause of action, plaintiff has offered no evidence tending to support such a claim. Therefore, Defendants' motion for summary judgment to dismiss plaintiff's claim under subsection (19) of the CHRL is granted in full.

### II. Defamation

Plaintiff brings a claim for defamation against individual defendant Libutti, based on statements that he allegedly made to Fatica Gallo, plaintiff's wife, about a sexual harassment complaint that had been lodged against plaintiff by another Alitalia employee. Plaintiff claims that Libutti told plaintiff's wife that plaintiff was a homosexual and that he had a sexual affair with another male employee at Alitalia.

A claim for defamation consists "of the twin torts of libel and slander." *Albert v. Loksen,* 239 F.3d 256, 265 (2d Cir.2001). "Generally spoken defamatory words are slander; written defamatory words are libel." *Id.* (citing *Matherson v. Marchello,* 100 A.D.2d 233, 239, 473 N.Y.S.2d 998 (2d Dep't 1984); *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 176 (2d Cir. 2000)). In this case, plaintiff's claim for defamation is based upon words spoken to plaintiff's wife, and is therefore a claim for slander.

The elements for a cause of action for slander in New York differ from those for libel. *See Matherson,* 100 A.D.2d at 235–36, 473 N.Y.S.2d 998. Slander requires: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert,* 239 F.3d at 265–66 (citing *Dillon v. City of New York,* 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1 (1st Dep't 1999) (citing Restatement (Second) of Torts § 558 (1976))).

For the purposes of this motion, Libutti argues that plaintiff has failed to satisfy the second and sixth prongs of the requirements for slander. First, Libutti argues that accusations of homosexuality are not slanderous per se, and since plaintiff has not shown any special harm, the claim for defamation fails. He argues that an accusation of adultery is not slanderous per se. Second, Libutti asserts that the statement made was not defamatory because it was true.

## A. Slander Per Se

### 1. Homosexuality

■ Focusing on the sixth prong, plaintiff must provide sufficient evidence that the defamatory statement of fact either caused him a special harm or that the statement is considered slanderous per se. *Albert,* 239 F.3d at 271. A "special harm" is considered "the loss of something having economic or pecuniary value." *Id.* (citing *Liberman v. Gelstein,* 80 N.Y.2d 429, 434–35, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y.Sup.Ct.1992) (quoting Restatement (Second) of Torts § 575 cmt. b (1976))). Plaintiff has not provided any evidence that he suffered any special harm; rather, he contends that the defamatory statement should be deemed slanderous per se.

■ In New York, a statement is considered defamatory when it "tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Foster v. Churchill,* 87 N.Y.2d 744, 751, 642 N.Y.S.2d 583, 665 N.E.2d 153 (N.Y.Sup.Ct. 1996); *see also Albert,* 239 F.3d at 265 n. 6 (noting that New York still uses similar definitions of defamatory). There are at least four categories of statements that both parties agree constitute slander per se: statements that "(i) charge the plaintiff with a serious crime; (ii) tend to injure the plaintiff in his or her trade, business or profession; (iii) imply that the plaintiff has a loathsome disease; or (iv) impute unchastity to a woman." *Albert,* 239 F.3d at 271; *see also Tourge v. City of Albany,* 285 A.D.2d 785, 786, 727 N.Y.S.2d 753 (3d Dep't 2001).

However, because certain people view homosexuality as particularly reprehensible and immoral conduct, several New York courts have concluded that imputations of homosexuality are slanderous per se. *See, e.g., Moye v. Gary,* 595 F.Supp. 738, 740 (S.D.N.Y.1984) (noting that some New York courts include homosexuality); *Tourge v. City of Albany,* 285 A.D.2d 785, 786, 727 N.Y.S.2d 753 (3d Dep't 2001); *Privitera v. Town of Phelps,* 79 A.D.2d 1, 3, 435 N.Y.S.2d 402 (4th Dep't 1981); *abrogated on other grounds by Liberman v. Gelstein,* 80 N.Y.2d 429, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y.1992); *see also Nowark v. Maguire,* 22 A.D.2d 901, 901, 255 N.Y.S.2d 318 (2d Dep't 1964). The Court recognizes that many in our society no longer hold such beliefs, and that gay and lesbian persons have achieved many civil rights that were once denied them due to their status. However, homophobia is sufficiently widespread and deeply held that an imputation of homosexuality can—at least when directed to a man married to a woman—be deemed every bit as offensive as imputing unchastity to a woman.[16]

■ I therefore agree with these New York courts who have added "imputations of homosexuality" to the list of these types of statements that are per se slanderous. I note that no New York court (certainly not the New York Court of Appeals) has held that imputations of homosexuality do not qualify as per se slanderous. This Court's decision to include homosexuality in the slander per se category should not be interpreted as endorsing prejudicial views against gays and lesbians. *Contra Lewittes v. Cohen,* No. 03 Civ. 189, 2004 WL 1171261 at *3 n. 5 (S.D.N.Y. May 26, 2004) (suggesting that including homosexuality in a per se category is counter-productive to gay rights). Rather, this decision is based on the fact that the prejudice

---

**16.** All the sexual categories of slander per se appear somewhat outmoded in view of contemporary mores.

gays and lesbians experience is real and sufficiently widespread so that it would be premature to declare victory. If the degree of this widespread prejudice disappears, this Court welcomes the red flag that will attach to this decision.

■ In this case, defendant Libutti is accused of having told plaintiff's wife that plaintiff was a homosexual and had a sexual affair with another male employee. Libutti's statement to plaintiff's wife imputes homosexuality to the plaintiff, and thus is slanderous per se.

### 2. Adultery

Plaintiff also asserts that Libutti's statement to his wife was slanderous per se because accusations of adultery are slander per se. Plaintiff does not advocate that adultery should be a new per se category recognized by this Court. Rather, he seems to advocate that adultery should be included in one of the five per se categories recognized.

In examining the possible categories, there are only two that could arguably include adultery: 1) statements that charge the plaintiff with a serious crime; or 2) statements imputing unchastity to a woman.

### a. Serious Crime

Adultery is not a serious crime, and therefore is not included in that slander per se category. Adultery is a class B misdemeanor under New York law. N.Y. Penal Law § 255.17. "Not every imputation of unlawful behavior ... is slanderous per se.... Thus, the law distinguishes between serious and relatively minor offenses, and only statements regarding the former are actionable without proof of damage." *Liberman,* 80 N.Y.2d at 435, 590 N.Y.S.2d 857, 605 N.E.2d 344. The crime of adultery does not meet this standard; it is the lowest grade of criminal offense. *See Cavallaro v. Pozzi,* 28 A.D.3d

1075, 1077, 814 N.Y.S.2d 462 (4th Dep't 2006) ("[I]f adultery were deemed a serious crime, then all crimes necessarily would constitute serious crimes and the use of the adjective "serious" in *Liberman* would be rendered superfluous.").

### b. Unchastity

■ Plaintiff argues that the unchastity category applies to both genders equally, such that imputations of adultery are slanderous per se whether addressed to a woman's conduct or a man's. *See Rejent v. Liberation Publications, Inc.,* 197 A.D.2d 240, 244–45, 611 N.Y.S.2d 866 (1st Dep't 1994). I agree.

In *Rejent,* the court affirmed the denial of a motion to dismiss a libel claim that imputed sexual immorality to the male plaintiff. Notably, *Rejent* sounds in a libel, not slander, and the standards for these two torts differ. *Id.* (noting the same). Also, the court's state about unchastity came in *dicta,* and from an intermediate appellate court. It does not appear that the New York Court of Appeals has considered the issue.

However, finding that the unchastity category applies to both genders equally avoids any need to examine the serious equal protection clause problem that would otherwise exist. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) ("prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."); *see also Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may

be avoided.") (Brandeis, J., concurring) (internal citation and punctuation omitted).

 Therefore, Libutti's statement to plaintiff's wife that he had a sexual affair with a man is slanderous per se because it imputes unchastity to a man.

## B. Truth

 Libutti argues that his statement was not slanderous per se because the statement is true. Truth is a complete defense to a defamation claim. *See, e.g., Kehm v. Murtha*, 286 A.D.2d 421, 421, 730 N.Y.S.2d 243 (2d Dep't 2001). However, when there is a genuine issue of fact as to whether the alleged slander is true, a motion for summary judgment should be denied. *See id.*

 In this case, Libutti claims that he only told plaintiff's wife that plaintiff had been accused of having an ongoing sexual affair with Oksuz, and plaintiff does not dispute that Oksuz made such an accusation. However, plaintiff claims that Libutti told his wife that plaintiff is a homosexual and did in fact have a sexual affair with Oksuz. Plaintiff denies both that he is a homosexual and that he engaged in a sexual affair with Oksuz. There is a disputed issue of fact about what Libutti said, and whether or not what he said is true. As a result, Libutti's defense of truth should be evaluated by a jury.

## C. Hearsay

Libutti's final argument for why summary judgment should be granted on the defamation claim is that plaintiff solely relies on hearsay to support his claim that a slanderous statement was made.[17] Obviously, plaintiff may not rely solely on hearsay to oppose a motion for summary judgment. *See Albert*, 239 F.3d at 266.

However, Fatica Gallo has submitted an affidavit attesting to the fact that Libutti made the statement. Her testimony is not hearsay, because it is offered to prove the fact that the words were spoken—not the truth of the matter asserted.

The Defendants ask this Court to exclude Fatica Gallo's affidavit because it was untimely filed. Although the affidavit appears to have been filed late due to the fault of plaintiff's counsel, this Court declines to penalize plaintiff for the numerous failings of his lawyers in addressing the summary judgment motion. The affidavit provides evidence that a slanderous statement may have been made, and this evidence did not prejudicially affect the Defendants' main arguments for summary judgment.

## D. Vicarious Liability

Defendant Alitalia, noting that it can only be held liable for a defamation claim on a theory of vicarious liability, argues that the defamation claim against it should be dismissed because defendant Libutti did not make a defamatory statement. As there is a disputed issue of fact concerning whether Libutti made a slanderous statement, Alitalia's motion for summary judgment on plaintiff's defamation claim is denied. *See Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 544–46, 435 N.Y.S.2d 556, 416 N.E.2d 557 (N.Y.1980).

## III. Breach of Contract

Plaintiff contends that Alitalia breached the Agreement after the company decided not to renew the Agreement and end plaintiff's consultancy. Specifically, plaintiff claims that Alitalia—and (mysteriously) the individual defendants—breached the Agreement by not providing him with: 1)

---

17. The Defendants originally argued that the defamation claim is time-barred by New York's statute of limitations. However, in a subsequent letter addressed to this Court, dated September 15, 2008, Defendants withdrew this argument.

miscellaneous employee benefits; 2) long term disability insurance; and 3) the opportunity to negotiate towards a new agreement.

Alitalia moves for summary judgment on the breach of contract claim by arguing that: 1) there is no issue of disputed fact that plaintiff received all of the miscellaneous benefits to which he was entitled under the Agreement; and 2) that plaintiff does not have a valid complaint about long-term disability insurance because such a claim is preempted by federal ERISA law.

 "Under New York law, an action for breach contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."[18] *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525 (2d Cir.1994). Additionally, "[A] non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. 209, 216 (S.D.N.Y.1997).

The individual defendants' motion for summary judgment on the contract claim is granted because there is no evidence that they were signatories to the contract, assumed the contract, or had been assigned the contract.

As for Alitalia and plaintiff, they do not dispute that there is a contract, and that plaintiff performed his obligations under the contract. However, plaintiff claims that Alitalia stopped paying him numerous employee benefits to which he is entitled. Alitalia counters by claiming that plaintiff has provided no evidence that shows he was denied such benefits.

The relevant section of the Agreement provides, in full:

> In consideration for Employee's execution of this Agreement, and Employee's fulfillment of the promises made in this Agreement, Alitalia agrees to pay Employee the following consideration, upon signature of this Agreement: (a) A lump sum incentive payment equal to three hundred thousand dollars gross of taxes ($300,000 USD); (b) A lump sum contribution to Employee's pension in the amount of fifty-four thousand dollars ($54,000 USD); (c) *continuation of all employee benefits to which Employee is currently entitled and in which he is currently participating, or payment necessary to privately purchase their equivalents, up to age sixty-five (65). As a result of this Agreement, upon his last day of employment, Employee will not forfeit and will still be entitled to payment for all benefits to which he had vested up through that point, including but not limited to his accrued pension, 401(k) balance, and accrued, unused vacation.*

(Sept. 15, 2005 Agreement ¶ 2 (emphasis added).) Plaintiff claims that, at the end of May 2006, Alitalia stopped: 1) paying for his automotive expenses; 2) paying for his health insurance; 3) contributing to his 401(k) plan; 4) cancelled his Supplemental Pension Plan; 5) failed to provide him with a Gold Rolex watch; and 6) failed to reimburse him for entertainment expenses for the Italian Vice–Prime Minister's visit to New York City.

Alitalia responds by providing evidence that plaintiff: 1) received a lump-sum payment of $47,000 to cover automotive and cell phone expenses; 2) continues to be covered by Alitalia's group health insurance, life insurance, accidental death insurance, short-term disability insurance policies and its dental plan; 3) and that Alitalia continues to pay for plaintiff's car insurance.

---

**18.** The Agreement expressly provides that New York law governs its construction.

■ The parties' dispute about the value of the miscellaneous benefits that plaintiff is owed until age sixty-five raise genuine issues of material fact that should go to a jury.

■ However, plaintiff's claim that Alitalia breached the Agreement when the insurance carrier, UNUM, decided to reject plaintiff's long-term disability claim must be dismissed. As a matter of law, this claim fails because federal ERISA law pre-empts any contractual claims associated with the processing of benefits.

29 U.S.C § 1144(a), requires that provisions of ERISA "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." The Second Circuit has determined that section 1144(a) pre-empts "common law tort and contract actions asserting improper processing of a claim for benefits under an ERISA-covered benefit program." *Aetna Life Ins. Co. v. Borges,* 869 F.2d 142, 146 (2d Cir.1989). Thus, plaintiff's dispute about receiving his long-term disability claim is properly resolved by using the enforcement scheme laid out in ERISA. *See* 29 U.S.C. §§ 1132, 1133, 1144.

■ Finally, plaintiff contends that Alitalia breached the Agreement by failing to provide him with an opportunity to negotiate a new agreement when the consultancy was cancelled. The Agreement explicitly states that plaintiff should be afforded such an opportunity to negotiate. (*See* Sept. 15, 2005 Agreement ¶ 3.) ("If the consultancy is cancelled by Alitalia in due time, the parties will have the opportunity to negotiate towards a new agreement."). However, before the expiration of the contract, plaintiff became totally disabled and was unable to work. He has not submitted any evidence tending to show that what he claims was a total disability ended

by March 2007. Therefore, he suffered no damages as a result of Alitalia's failure to offer him a chance to reach a new deal. Re-negotiation would have been futile on the undisputed facts of this case. *See, e.g., 24/7 Records, Inc. v. Sony Music Entertainment, Inc.,* 566 F.Supp.2d 305, 313 (S.D.N.Y.2008) (it is "the long-standing principle of New York law that once it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent.") (citing *Allbrand Discount Liquors. Inc. v. Times Square Stores Corp.,* 60 A.D.2d 568, 568, 399 N.Y.S.2d 700, (2d Dep't 1977) (internal punctuation and other citations omitted)).

Accordingly, Alitalia's motion for summary judgment based on the contract claim is granted in part and denied in part.

## IV. Intentional and Negligent Infliction of Emotional Distress

### A. Intentional Infliction of Emotional Distress

■ Under New York law, a claim for intentional infliction of emotional distress requires a plaintiff to prove: "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal relationship between conduct and the resulting injury; and (4) severe emotional distress." *Green v. Harris Publications, Inc.,* 331 F.Supp.2d 180, 195 (S.D.N.Y.2004) (Citing *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996); *Howell v. N.Y. Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (N.Y.1993)). The crux for a claim of intentional infliction of emotional distress is predicated "on the basis of extreme and outrageous conduct, which so transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society." *Freihofer v. Hearst Corp., Doing Business as Capital Newspapers Group,*

65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 480 N.E.2d 349 (N.Y.1985). Thus, in analyzing a claim for intentional infliction of emotional distress, "courts look to the first element whether the conduct was extreme or outrageous." *Green,* 331 F.Supp.2d at 195.

It is all but impossible for a plaintiff to provide sufficient evidence to satisfy the extreme and outrageous conduct requirement. Indeed, the "threshold of outrageousness is so difficult to reach that, of the intentional infliction of emotional distress claims considered by the Court of Appeals, everyone has failed because the alleged conduct was not sufficiently outrageous." *Seltzer v. Bayer,* 272 A.D.2d 263, 265, 709 N.Y.S.2d 21 (1st Dep't 2000) (internal citation omitted).

In *Seltzer,* the court dismissed the plaintiff's intentional infliction of emotional distress claim because the conduct in question failed to rise to the level of outrageousness that New York law requires. The plaintiff in *Seltzer* claimed that the defendant dumped a pile of cement on the sidewalk in front of his house, threw lighted cigarettes into his backyard, threw eggs on his front steps, and threatened to paint a swastika on his house. *Id.* at 265, 709 N.Y.S.2d 21. The court found that as "noxious and deplorable ... [as] this conduct may be, these incidents do not rise to the level of outrageousness or the kind of deliberate and malicious campaign of harassment or intimidation that can survive a motion for summary judgment...." *Id.* (internal citation omitted).

By contrast, in *Collins v. Willcox Incorp. et al.,* the New York Supreme Court did not dismiss a claim for intentional infliction of emotional distress. 158 Misc.2d 54, 600 N.Y.S.2d 884 (N.Y.Sup.Ct.1992). In that case, plaintiff claimed that the defendant made repeated and unwanted sexual advances toward her, including touching. The court noted that such deplorable conduct is not typically actionable

for a claim of intentional infliction of emotional distress. *Id.* However, because the conduct was continuous and was directed at a married person in "an attempt to induce violation of a person's marital vows and trust", a jury could find the conduct to be sufficiently outrageous. *Id.* The court placed special emphasis on the fact the defendant was intentionally trying to corrupt a woman's "marital state." *Id.*

■ In this case, plaintiff alleges that Defendants' conduct was sufficiently outrageous because he endured harassment on a daily basis, his complaints of such conduct went unheeded, and he was assaulted twice. I disagree. Typically harassment and some physical touching are not enough to satisfy the extreme and outrageous standard under New York law. Plaintiff has claims under the HRL and the CHRL to address this sort of behavior. Therefore, Defendants motion for summary judgment is granted.

**B. Negligent Inflection of Emotional Distress**

■ New York Workers' Compensation law provides the exclusive remedy for an employee's claim of negligent infliction of emotional distress. Workers' Comp. Law § 29(6); *see also Burlew v. American Mutual Ins. Co.,* 63 N.Y.2d 412, 416–17, 482 N.Y.S.2d 720, 472 N.E.2d 682 (N.Y. 1984) (dismissing a cause of action for negligent infliction of emotional distress because Workers' Compensation Law provides the exclusive remedy); *Gerson v. Giorgio Sant'Angelo Collectibles, Inc.* 176 Misc.2d 388, 671 N.Y.S.2d 958, 961 (N.Y.Sup.Ct.1998). For that reason, plaintiff's cause of action for negligent infliction of emotional distress is barred and Defendants' motion for summary judgment is granted.

## V. Conclusion

For the stated reasons above, the Defendants' motion for summary judgment is granted in part and denied in part. Consequently, plaintiff's SEVENTH and EIGHTH causes of action are dismissed with prejudice against all parties. Plaintiff's FIRST, SECOND, THIRD, FOURTH, FIFTH and SIXTH causes of action based on disability and citizenship discrimination are dismissed with prejudice against the Defendants. Plaintiff's FIRST, SECOND, FOURTH, FIFTH and TENTH causes of action are dismissed with prejudice against the individual defendants. Plaintiff's THIRD and SIXTH causes of action are dismissed with prejudice against Alitalia. Plaintiff's FIRST and FOURTH causes of action based on discriminatory termination are dismissed with prejudice against Alitalia. Plaintiff's TENTH cause of action based on long-term disability benefits and re-negotiation rights is dismissed with prejudice against Alitalia.

This constitutes the decision and order of the Court.